# EXHIBIT 40

EXHIBIT 40

PERRIE M. WEINER (SBN 134146)
perrie.weiner@dlapiper.com
EDWARD D. TOTINO (SBN 169237)
edward.totino@dlapiper.com
MONICA D. SCOTT (SBN 286109)
monica.scott@dlapiper.com
**DLA PIPER LLP (US)**
2000 Avenue of the Stars, Suite 400 North Tower
Los Angeles, CA 90067-4704
Telephone: 310.595.3000
Facsimile: 310.595.3300

Attorneys for Defendant
SIX CONTINENTS HOTELS, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

LAURA MCCABE and LATROYA SIMPSON, individually and on behalf of similarly situated individuals,

Plaintiffs,

v.

SIX CONTINENTS HOTELS, INC.; and DOES 2 through 10, inclusive,

Defendants.

CASE NO. C12-4818-NC

**DECLARATION OF MONICA D. SCOTT IN SUPPORT OF MOTION AND MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF RANDALL A. SNYDER**

Date: September 24, 2014
Time: 1:00 p.m.
Place: Courtroom A, 15th Floor

Complaint Filed: July 8, 2012
FAC Filed: July 19, 2012
SAC Filed: Oct. 11, 2013
Trial Date: None

I, Monica D. Scott, declare and state as follows:

1. I am an attorney in the Los Angeles office of DLA Piper LLP (US), counsel of record for Defendant SIX CONTINENTS HOTELS, INC. ("Six Continents"). I have personal knowledge of the facts contained in this Declaration and, if called as a witness, could and would testify as to their accuracy.

2. A true and correct copy of the Declaration of Randall A. Snyder sent to me by Plaintiffs' counsel via e-mail on July 7, 2014 is attached hereto as Exhibit "A."

3. Mr. Snyder was deposed in this action on July 23, 2014. True and correct copies of selected pages from Mr. Snyder's deposition transcript are attached hereto as Exhibit "B."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this15th day of August 2014, in Los Angeles, California.

s/ Monica D. Scott
MONICA D. SCOTT

# EXHIBIT "A"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA MCCABE and LATROYA SIMPSON, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>INTERCONTINENTAL HOTELS GROUP RESOURCES, INC.; INTERCONTINENTAL HOTELS OF SAN FRANCISCO, INC.; SIX CONTINENTS HOTELS, INC.; and DOES 2 through 10, inclusive,<br><br>Defendants. | Case No.: 3:12-cv-04818-NC<br><br>**DECLARATION OF RANDALL A. SNYDER** |



Exhibit A

## DECLARATION OF RANDALL A. SNYDER

I, Randall A. Snyder, hereby declare as follows:

1. My name is Randall A. Snyder. I am an adult over the age of 18 and a resident of the State of Nevada. I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

2. I am an independent telecommunications technology consultant and reside at 8113 Bay Pines Avenue, Las Vegas, Nevada, 89128. I have been retained by Keller Grover LLP and Law Offices of Scot D. Bernstein, A Professional Corporation, in the matter *McCabe v. Six Continents Hotels, Inc.*, 3:12-cv-04818-NC (N.D. Cal.) to provide my expert opinions relating to telephone number analysis in connection with certification of the proposed class. In particular, I have been asked to opine on the methodology and process whereby a list of telephone numbers can be analyzed to determine which are cellular telephone numbers and which are landline telephone numbers. In addition, I have been asked to provide my expert opinions regarding the ability to ascertain whether a particular individual is a member of the proposed class based solely upon a telephone number.

3. My opinions in this declaration are based on my education, knowledge, experience, expertise, training and my review of the following documents in this case: Second Amended Complaint for Damages and Injunctive Relief; Plaintiffs' Notice of Motion and Motion to Amend the Complaint; Memorandum of Points and Authorities in Support Thereof; Declaration of Eric A. Grover in Support of Plaintiffs' Motion to Amend the Complaint; Plaintiffs' Reply in Support of Motion to Amend the Complaint; Opposition to Motion to Amend the Complaint; Order Granting Plaintiffs' Motion to Amend the Complaint; Notice of Motion and Motion to Dismiss Plaintiffs' Second Amended Class

Action Complaint; Defendant Six Continents Hotels, Inc.'s Reply Brief in Support of Its Motion to Dismiss Plaintiffs' Seconded Amended Complaint; Defendant's Request for Judicial Notice in Support of Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint; Plaintiffs' Opposition to Motion to Dismiss Second Amended Class Action Complaint; Plaintiffs' Request for Judicial Notice in Support of their Opposition to Defendant's Motion to Dismiss the Second Amended Complaint; Declaration of Eric A. Grover in Support of Their Opposition to Defendants' Motion to Dismiss the Second Amended Complaint; Order Denying Six Continents' Motion to Dismiss; Deposition of George Floor, II; Deposition of Michael Gardner; Deposition of Maria Bazley; Deposition of Kevin Randall; Deposition of Jim Emery; California Penal Code § 632, "Eavesdropping on or recording confidential communications"; California Penal Code § 632.7, "Cordless or cellular radio telephones; intentional recordation of communications without consent; punishment; exceptions"; and California Penal Code § 637.2, "Civil action by person injured; injunction."

4. A copy of my *curriculum vitae* is attached to this Declaration. I have over 28 years of experience in telecommunications network and system architecture, engineering, design and technology. I am an expert in the fields of both wireline and wireless telecommunications networking technology. I have been retained as a testifying or consulting expert in more than 75 cases regarding cellular telecommunications technology. In addition, I have been retained as an expert by both plaintiffs and defendants in class action lawsuits.

5. I have taught many classes and seminars on both wireline and wireless telecommunication network technologies and have been a panelist and speaker at numerous conferences of the

Institute of Electrical and Electronics Engineers ("IEEE"), the Personal Communication Society ("PCS"), and the Cellular Telecommunications and Internet Association ("CTIA") as an expert in telecommunication networks. I spent seven years developing standards within the American National Standards Institute's subsidiary organization, the Telecommunications Industry Association ("TIA"), providing technical contributions and authoring and editing telecommunications proposed standards documents. Most notably, I authored and oversaw the standardization of Interim Standard 93, providing interconnection technology between wireline and wireless networks, which is a fully accredited national standard of the American National Standards Institute ("ANSI"). I am the co-author of two McGraw-Hill books: "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition," published in 1997 and 2001, respectively. These books have sold several thousand copies and were required reading for wireless engineers at AT&T Wireless and Motorola for several years. The latter book also has been relied upon and cited numerous times as a reference for various patents in the telecommunications industry. I have been issued 18 patents myself on telecommunications networking technology and currently have six additional published patents pending. I also have authored several articles on telecommunications technology and have been quoted numerous times in industry trade publications. I have consulted for and been employed by many wireline and wireless telecommunications companies including McCaw Cellular, AirTouch, AT&T Wireless, AT&T Mobility, Lucent, Nokia, Ericsson, Nextwave, MCI, Sprint and other telecommunications technology vendors and service providers. I also was nominated in 2006 for a National Television Arts Emmy Award for Outstanding Achievement in

Advanced Media Technology for unique wireless content distribution technology I designed while employed at Entriq, Inc.

6. Still more detail, as well as details of publications that I have authored or co-authored within at least the past 10 years, are provided in my *curriculum vitae*, a true and correct copy of which is attached hereto as Exhibit A, along with a list of cases in which I served as a testifying or consulting expert and my standard rate sheet. I am being compensated at the rate of $450 per hour for my study, analysis and testimony in this case. (Exhibit A.)

**INTRODUCTION**

7. Based on my education, knowledge, experience, expertise, and training, my review of the relevant documents provided by the Plaintiff and the facts described above, it is my expert opinion that it is a common and straight-forward administrative process to determine (1) whether a telephone number included in a list or database of telephone numbers is a cellular telephone number or a landline (aka "wireline") telephone number and (2) which telecommunications carrier served that telephone number at the time the alleged call violations occurred. Furthermore, it is my expert opinion that, for the cellular telephone numbers derived, it is possible to determine whether each calling party's calling location was within or outside California.

8. Based on my education, knowledge, experience, expertise and training, it is my expert opinion that the proposed members of the class in this case can be definitively and clearly ascertained based solely on their telephone numbers.

**TELEPHONE NUMBERING AND NUMBER ANALYSIS**

9. In November, 2003, the Federal Communications Commission ("FCC") mandated the implementation of a service known as "number portability" to be offered by both wireline

Case3:12-cv-04818-NC Document80-8 Filed07/08/14 Page6 of 61

and cellular common carriers to all wireline and cellular subscribers. Specifically, the service is characterized by two features: Local Number Portability ("LNP") and Wireless Local Number Portability ("WLNP"). LNP enables cellular subscribers to "port," or transfer, their home wireline telephone numbers from a wireline carrier to a cellular carrier within a defined geographic local area to essentially become cellular telephone numbers and vice versa. WLNP enables cellular subscribers to "port," or transfer, their cellular telephone numbers from one cellular carrier to another, allowing them, in effect, to own their telephone numbers regardless of the cellular carrier to which they wish to subscribe.

10. Because of number portability, there is no distinguishing characteristic within the telephone number format and the value of the digits themselves to determine which carrier services a particular telephone number and whether the number is even a wireline or cellular number. The standard numbering plan in the United States for both wireline and cellular telephone numbers is the ten-digit number of the format "NPA-NXX-XXXX." "NPA" refers to the Numbering Plan Area, more commonly known as the three-digit "area code." The NPA is also of the format "NXX." The entire format of the number, "NXX-NXX-XXXX" refers to a numbering plan where the digit "N" can be any number from 2 through 9 and the digit "X" can be any number from 0 through 9.

11. If a subscriber wishes to port his or her wireline telephone number to a cellular telephone number, or to do the reverse, or to port his or her telephone number to another competing wireline or cellular carrier, the carrier is required to do so within a few hours or less. To do this, all of the wireline and cellular carriers are connected to a nationwide real-time number portability database. The primary number portability database is owned, operated and maintained by an independent company known as Neustar, Inc. Neustar maintains and

operates by far the most authoritative and popular database serving the carriers. Because of the FCC mandate for number portability among all common carriers, a centralized real-time telephone number portability database needs to be employed so that all telephone calls can be routed to the appropriate carrier network and be completed. Without that database, it would be difficult or impossible to route the calls to the appropriate carriers.

12. The number portability database essentially associates each and every individual telephone number with a wireline or cellular carrier network identifier, enabling calls to be connected to the proper wireline or cellular carrier network. Before number portability came into effect, a number portability database was not necessary. Instead, the appropriate carrier was easily determined by simply examining portions of the telephone number itself, as the first six digits of the number clearly identified which telecommunications carrier owned and served that number. But with number portability, as part of the process of establishing each and every telephone call and delivering those calls to the proper network servicing the called party numbers, the number portability database must be queried in real-time so that calls will terminate in the proper carrier network and be delivered to the called party. Due to the critical nature of this service, the reliability of Neustar's database is, and must be, among the highest in the telecommunications industry.

13. Prior to November, 2003 and the implementation of number portability as mandated by the FCC, the North American Numbering Plan Administrator ("NANPA") provided blocks of numbers to each individual telephone carrier (either wireline or cellular) to provide to its subscriber customers. The NANPA is the North American authority that operates, manages and maintains all aspects of the use of telephone numbers in the United States and its territories, Canada, Bermuda and 17 Caribbean nations. Because number portability had yet

to take effect, the values of telephone numbers of the format "NXX-NXX-XXXX" easily and unambiguously revealed whether an individual telephone number was served by a wireline or cellular telecommunications carrier. This is because blocks of numbers provided by the NANPA to the individual telecommunications carrier companies were based upon the NPA values (the first three digits of the telephone number, with the format "NXX") and the exchange code values (the second three digits of the telephone number, with the format "NXX"). From just before November 2003 through the present, in addition to providing the number portability database, Neustar, Inc. has reliably maintained and operated the North American Numbering Plan and serves as the NANPA.

14. There exist several commercially available third-party information service companies that collect and maintain telephone and subscriber data either on behalf of the wireless carriers or for various other commercial information purposes such as providing notice to class members in class actions. These companies lease and maintain access to Neustar's number portability database.

15. I have a great deal of personal and technical experience with Neustar,[1] as well as third-party information service companies including A.B. Data,[2] CompliancePoint[3] (a subsidiary of PossibleNOW), and Contact Center Compliance.[4] All three are well-known organizations that maintain and provide telephone number database services.

16. A.B. Data, Ltd., CompliancePoint and Contact Center Compliance all maintain a complete database, updated daily, of all telephone numbers and related information used in North

[1] See http://www.neustar.biz/resources/product-literature/lead-buyers-tcpa#.Uz7lDl7qcjE.
[2] See http://www.ABDataClassAction.com/NoticeAdministration.aspx.
[3] See http://www.CompliancePoint.com.
[4] See http://www.DNC.com.

America. The telephone number database is provided to them by Neustar and provides information about each and every telephone number in use in North America. That information includes whether the telephone number is being served by a wireline or cellular telecommunications carrier, the cellular carrier's name and the porting history of the telephone number. In fact, these companies can even reveal the status of a particular telephone number as of some given date in the past, regardless of whether the number ever was ported prior to or after that date. Cellular telephone numbers that never were ported are guaranteed always to have been cellular telephone numbers. Furthermore, the Neustar database is updated on a daily basis to ensure that both past and present telephone number data is always reliable and preserved. I have personally been involved in contracting with these organizations to provide telephone number data analysis in class action lawsuits.

17. These information service companies, as well as many others, are commonly used by debt collection and telemarketing companies to analyze databases or lists of telephone numbers prior to calling them. Telephone numbers provided as an electronic list or database are "scrubbed" by these companies to determine which ones are cellular telephone numbers and which are wireline telephone numbers. "Scrubbing" is a term commonly used to describe a process by which a list of telephone numbers is compared against another list of telephone numbers having additional parameters associated with those numbers. If a telephone number is revealed to be a cellular telephone number by this "scrubbing" process, it can be treated appropriately and in accordance with all local, state and federal statutes and regulations. For example, telemarketers need to recognize cellular telephone numbers and eliminate them from their call databases so that they do not place marketing calls to cellular telephones in violation of the Telephone Consumer Protection Act. Thus,

that scrubbing capability exists and must exist for purposes entirely unrelated to the subject matter of the present lawsuit.

**SUBSCRIBER CALL DETAIL RECORDS**

18. All cellular telecommunications carriers record, maintain and store detailed information about all of their subscribers. That information includes call detail records ("CDRs"). CDRs include detailed information regarding each individual subscriber's telephone calls, including each mobile-originating call to a telephone number from the cellular subscriber and each individual mobile-terminating call from a telephone number to the cellular subscriber. Each line-item CDR represents an individual call and includes the telephone number of the calling party (*i.e.*, the telephone number of the party originating the call), the telephone number of the called party (*i.e.*, the telephone number of the party receiving the call), the date the call was made, the time the call was made, the length of the call, the switching system from where the call originated and the cell site serving the subscriber for the call. CDRs including this data, and potentially additional data if requested, can be obtained and produced by the wireless carriers via subpoena using only the cellular telephone number as the unique identifying piece of data that will serve as the information for a detailed call record search.

19. The switching system from which a mobile-originated call emanates and the connected cell site are at static building locations with geographic addresses. The CDRs reveal identification codes for the actual geographic locations of these network elements and provide the geographic cellular area from where the call originated. Thus, CDRs for particular cellular telephone numbers can provide information revealing whether the calling party was within the boundaries of California or not when the cellular call was placed. In

cases where the cell site information is no longer available, the identification code of the switching system is still available as it is an information element included in the standard CDRs. Thus, even when the cell site information no longer is available, it still is possible to determine whether a call originated from within California.

20. Exhibit B contains the latest publicly available information regarding cellular data and information that can be obtained under subpoena from each of the primary cellular carriers and the corresponding data retention periods for each of those carriers. Although this information is dated March, 2011, I have no reason to believe that this information it is not still reliable and accurate. In addition, Exhibit C describes the cellular call detail information available from Sprint Corporation; Exhibit D describes the cellular call detail information available from AT&T Mobility; and Exhibit E describes the cellular call detail information available from Verizon Wireless. Based on my experience and knowledge, I am confident that comparable data and information can be provided from all other cellular carriers.

**ASCERTAINABLITY**

21. The process to ascertain and identify proposed class members solely from their cellular telephone numbers is a straightforward and highly effective administrative process.

22. Cellular carriers maintain bill copies, payment histories and subscriber identifying information including the subscriber's name and address and the time period when the subscriber had a particular cellular telephone number in service (see Exhibit B). The primary carriers maintain this data for at least three to five years. All of this detailed and recorded information for each subscriber can be obtained via subpoena using only the

cellular telephone number as the unique identifying piece of data required for a detailed subscriber search.

23. In cases where subscriber identifying information is no longer maintained by a particular cellular carrier, there are commercially available third-party information service companies that collect and maintain subscriber data either on behalf of the cellular carriers or for various other commercial services. These companies maintain comprehensive and extensive databases that identify subscribers based solely on their cellular telephone numbers and maintain this data over several years. These companies include the previously mentioned Neustar, A.B. Data, Ltd., CompliancePoint and Contact Center Compliance, all well-known organizations that maintain extensive demographic databases containing cellular telephone subscription information and associated identifying data. These databases are updated on a daily basis to ensure that both past and present cellular subscriber data is always reliable and preserved. I have been involved in contracting with these organizations to provide such cellular subscriber and identifying data in many class action lawsuits.

24. Each of the cellular carriers can be subpoenaed or one of the appropriate third-party information service companies can be contracted to produce subscriber identifying information for the date an alleged call violation occurred. That information can include name, address and other information, and be retrieved based solely on the provided cellular telephone number representing a particular subscriber.

**SUMMARY OF OPINIONS**

25. Based on my education, knowledge, experience, expertise and training, my review of the relevant documents provided by the Plaintiff and the facts described above, it is my expert

opinion that any size list or database of telephone numbers can be reliably analyzed to determine (1) which numbers are cellular telephone numbers and (2) each number's porting history. It is a common and straightforward administrative process to determine whether a telephone number included in a list or database of telephone numbers is a cellular telephone number. In fact, these companies can even reveal the status of a particular telephone number as of some given date in the past, regardless of whether the number ever was ported before or after that date. Furthermore, it is my expert opinion that call detail record information can be obtained that reveals whether a proposed member of the class was within California at the time an alleged call was made.

26. Based on my education, knowledge, experience, expertise and training, it is my expert opinion that the proposed members of the class in this case can be definitively and clearly ascertained based solely on their cellular telephone numbers. The process to identify these proposed class members from their cellular telephone numbers is a straightforward and highly accurate administrative process.

27. My opinions in this declaration are based upon extensive experience in the telecommunications industry, a detailed understanding of telecommunications systems and a detailed understanding of telecommunications carrier operations. I hereby reserve the right to supplement or modify my opinions detailed in this report to the extent that new information is made available through discovery or other means.

28. I declare that the foregoing is true and correct subject to the laws of perjury of the State of California and the United States of America.

Executed in Las Vegas, Nevada, on this 1st day of July 2014.

Randall A. Snyder

Randall A. Snyder

# EXHIBIT A

# Randall A. Snyder
# Curriculum Vitae

## Professional Summary

Randall Snyder is a recognized expert in wireless and cellular telecommunications technology, executive manager and leader, designing, developing, marketing and managing mobile telecommunication system and software products. He has over 30 years of experience specializing in wireless telecommunications technology, network architecture, design, system engineering, marketing and product management. He is a reputable leader and strategic developer with a successful background building startups. He is skilled presenter, communicator, and educator with success impacting organizational performance, corporate reputation and increasing sales. Mr. Snyder is results-oriented, highly organized and creatively focused on adhering to organizational missions and philosophy while designing best-of-breed mobile technology solutions. He has extensive travel experience to Asia-Pac, Latin America and Europe supporting engineering, sales and marketing with familiarity with wireless network operators and manufacturers worldwide. Mr. Snyder has several years of wireless standards development with extensive travel throughout Asia-Pac, Latin America and Europe.

## Expertise

- Business Relations: Seminars, Sales Presentations and Sales Engineering
- Legal: Provisional and Patent Applications, Subject Matter Expert Consultant, Expert Witness and Testimony, Litigation Support, Sales and Vendor Contract Negotiations and Review, Qualified as an Expert in Federal District Court
- Management: Strategic/Tactical Planning, Product Management, Marketing Management, Operations Management, Competitive Analysis, Problem Resolution, Project Planning, Risk Management
- Organizational: P&L Management, Budget Planning, Expense Reduction and Cost Control
- Technology: Wireless Network Engineering, Design and Architecture, Multimedia Systems, Mobile Internet, Mobile Video, Mobile Marketing, mCommerce and Mobile Payments, Mobile Telecommunications Standards, 3G, UMTS, LTE, LBS, SMS, MMS, WAP, GSM, and ANSI-41 (CDMA) Networking, Signaling System No. 7 (SS7), Communications Protocols, Telephone Consumer Protection Act (TCPA), Automatic Telephone Dialing Systems (ATDS)

## Education

| Year | College or University | Degree |
|---|---|---|
| 1984 | Franklin and Marshall College | B.A., Mathematics (minor in Astronomy) |

**Randall A. Snyder**
**Curriculum Vitae**

## Professional Experience

From: January 2007
To: Present
Organization: Wireless Research Services, LLC; Las Vegas, NV
Title: President and Founder
Summary: Responsible for consulting business, and revenue as well as being the principal consultant. Areas of subject matter expertise include mobile and cellular networking, 3G, LTE, UMTS, GSM, ANSI-41, LBS, SMS, MMS, WAP, SS7, Diameter Signaling, Automatic Telephone Dialing Systems (ATDS) and mobile multimedia systems. With this expertise, primary consulting is in the area of system and product architecture, design, development, management and marketing as well as patent preparation and development, expert reports, expert testimony and litigation support. Expert witness and technology consultant for over 75 legal cases; authored over 60 expert reports for intellectual property cases, Telephone Consumer Protection Act (TCPA) cases and wireless technology litigation cases.

Notable Case:

- Personally cited by United States Court of Appeals for the Ninth Circuit, Satterfield v. Simon & Schuster, Inc. No. 07-16356, D.C. No. CV-06-02893-CW Opinion. Appeal from the United States District Court for the Northern District of California. Opinion by N.R. Smith, Circuit Judge. Filed June 19, 2009.

  Result of expert opinion greatly expanded the TCPA and was followed by formal FCC Declaratory Rulings that text messages are calls as defined by the TCPA and a stored electronic list of telephone numbers falls within the definition of an Automatic Telephone Dialing System (ATDS).

From: September 2007
To: August 2010
Organization: Finsphere Corporation; Bellevue, WA
Title: Vice President Product Management & Wireless Engineering
Summary: Was among the first handful of employees at Finsphere prior to Series A funding. As vice president of product management and wireless engineering and a member of the executive management team, was responsible for product management activities and wireless technology solutions for Finsphere's products. These products encompassed mobile location based software-as-a-service (SaaS) products offered primarily to financial institutions and banks. Responsibilities included product requirements and system functionality, strategic planning, R&D of new technologies, wireless network interconnectivity as well as wireless technology for Finsphere's products. Was also responsible for market strategies, white papers and development and management of intellectual property and patent applications.

From: May 2004
To: April 2007
Organization: Entriq, Inc.; Carlsbad, CA
Title: Vice President Product Management
Summary: Was responsible for the entire product management team and system architecture for Entriq's products and services. Products encompassed mobile and broadband pay media applications (specializing in video), digital rights management (DRM) and security solutions, e-commerce and m-commerce systems as well as ad management and delivery solutions for both broadband and mobile media services. Responsibilities also included network and protocol analysis, market analysis, evaluation of third-party software and services, all vendor contract negotiations, RFP responses and overall administrative responsibility for the entire product line. Was responsible for directing and managing the technical writing department producing all user documentation associated with the products. Was nominated for a National Television Arts and Sciences Emmy Award for Outstanding Achievement in Advanced Media Technology for unique mobile technology designed, developed and commercially deployed as part of Entriq's solution.

From: February 2002
To: November 2003
Organization: m-Qube, Inc. (acquired by Verisign); Boston, MA
Title: Vice President Product Management and Carrier Marketing
Summary: Was responsible for the entire product management and carrier marketing teams, member of the executive management team and one of the founders. Was responsible for all product management, system engineering and product strategy for all business conducted with the wireless industry and carriers. Was in charge of the market strategy and wireless network architecture for m-Qube's mobile marketing service, a value-added service offering mobile marketing solutions to wireless carriers using short message services (SMS) for GSM and CDMA networks. The service architecture enabled branded companies to deploy promotional marketing and messaging campaign dialogs with mobile subscribers via SMS. The network architecture required definition and design of all aspects of the overall network including SMS technology, interconnectivity to the wireless carriers, signaling, traffic management, market requirements for features and services, network equipment specifications and OA&M.

From: April 2001
To: February 2002
Organization: Bitfone Corporation; Mountain View, CA
Title: Vice President Product Management and Marketing
Summary: Was responsible for the entire product management team and all of the company's product definitions, strategies and positioning. Had direct responsibility for market and product requirements, market research, competitive analysis, product strategy and sales strategy. Bitfone's products included the iBroker, a mobile Internet technology infrastructure platform to enhance WAP, MMS, mobile e-mail and wireless

messaging. Was also responsible for the mProve product (obtained via merger with Digital Transit, Inc.) providing over-the-air firmware and software update technology to mobile devices.

From: November 2000
To: April 2001
Organization: Openwave Systems (via merger of Phone.com and Software.com); Redwood City, CA
Title: Executive Director Emerging Technologies
Summary: Was responsible for new 3G technologies and providing market and product plans for those technologies for the entire product line. Primary responsibility for the 3GPP Multimedia Messaging Service (MMS), collecting market requirements from customers, developing corporate strategy for MMS and preparing the organization for additional development of the product. In addition, taught wireless technology classes to the different departments at Openwave and educated them on wireless service provider strategies and network technologies.

From: March 2000
To: November 2000
Organization: @Mobile and Software.com (via acquisition); Santa Barbara, CA
Title: Director Wireless Product Management
Summary: Was responsible for the product managers and for all of the wireless internet infrastructure products. Responsibilities included the overall market and product strategy for Software.com's wireless e-mail, short message service, instant messaging and unified messaging products. Was responsible for the overall revenues generated from these products based on detailed product plans and internal organizational planning. Much of his time was spent working with the executive management team and the sales directors on corporate market strategy.

From: December 1999
To: March 2000
Organization: FreeSpace Communications, Inc.; Palo Alto, CA
Title: Consulting Network Systems Engineer
Summary: Was responsible for the complete design of the backbone network architecture for a new broadband fixed wireless data network. This new architecture incorporated DSL as the backbone network technology. The network architecture required definition and design of all aspects of the overall network plan including DSL technology, IP technology, ATM technology, interconnectivity to the PSTN, operations signaling, traffic engineering, market requirements for network features and services, network equipment specifications and OA&M.

From: April 1992
To: December 1999
Organization: Synacom Technology, Inc.; San Jose, CA

**Randall A. Snyder**
**Curriculum Vitae**

Title: Executive Director Product Marketing and Management
Summary:

1998 – 1999 Executive Director Product Marketing and Management

- Responsible for managing the entire product management and marketing department of Synacom Technology, including market research and planning, product management and market communications. Lead the entire design, definition and product direction of all aspects of Synacom's products.

1997 – 1998 Director Systems Engineering

- Responsible for coordinating and managing the overall functional and requirements specifications for all Synacom's products as well as the detailed test plans used for alpha system testing of those products. Also responsible for directing and managing the technical writing department producing all of the user documentation associated with all of the products. Provided the primary sales engineering support for sales and marketing and was involved in nearly every aspect of the product lifecycle.

1996 – 1997 Director Consulting Services and Principal Engineer

- Responsible for obtaining, coordinating and managing all technical consulting projects performed by the company. These projects included wireless network architecture and design for both IS-41 and GSM networks for dozens of client companies (carriers and equipment manufacturers). In this role, continued as a member of both the ANSI/TIA TR45.2 Subcommittee for cellular radio intersystem operations standards and the ANSI/TIA TR46 Committee for 1900 MHz GSM PCS standards. Major contributor to TR46 in the area of GSM-to-IS-41 network interworking. Also authored, edited and published TIA standard specification IS-93 for cellular network interconnections to the PSTN and ISDN.

1992 – 1996 Principal Engineer

- Consulted for McCaw Cellular, AT&T Wireless, AirTouch Cellular, AirTouch Satellite Services, Globalstar, Nokia, MCI, Sprint PCS, XYPoint, NextWave, NewNet American Personal Communications, CTIA and several other national and international wireless telecommunications companies.
- Wrote wireless network design and analysis papers including HLR specifications, Authentication Center specifications, PCS network design, short message service (SMS) design, intelligent network applications of wireless technology and in-house expert in signaling protocols. Extensive experience with Signaling System No. 7, including both protocol implementation and design. Authored the Standard Requirements Document for the SS7-based A-interface between the base station and MSC used throughout the TIA. Also involved in the design of the Bellcore WACS/PACS technology, digital cellular network service and feature descriptions, SCPs and HLRs. Extensive experience developing the architecture and design of distributed intelligent networks including, SS7, cellular, PCS, AIN and WIN networks. Key member of the original Cellular Digital Packet Data (CDPD) architecture and design team. Designed the CDPD air interface protocol emulator

developed and marketed by AirLink Communications, Inc.

From: December 1990
To: April 1992
Organization: AT&T Bell Laboratories; Whippany, NJ
Title: Consulting Member of the Technical Staff
Summary: Evaluated wireless technology services for the Wireless Systems Architecture group. Also participated as a system engineer on the design of the Global System for Mobile (GSM) communication architecture and a software engineer developing the base station controller (BSC) for GSM. Also responsible for planning, coordinating, designing and testing the SS7 protocol software for the GSM A-interface between the BSC, MSC and operations and maintenance center (OMC). High-level and detailed design specifications were developed to coordinate the protocol testing between two remote laboratories. Provided the traffic analysis and traffic engineering of call traffic for the BSC. Specifically designed and developed the dynamic traffic overload control subsystem for the BSC. Presentations were given to technical staffs at multiple Bell Laboratories facilities supporting this work.

From: May 1987
To: December 1990
Organization: DGM&S, Inc.; Mt. Laurel, NJ
Title: Senior Staff Consultant
Summary: Responsible for the design, development and test coordination of an advanced intelligent network applications platform for a service control point (SCP). Also spent several years as a consulting software engineer for Siemens AG, developing and testing SS7 and call control software for the EWSD digital switching system for international as well as U.S. national network implementations. This work involved extensive travel to both Frankfurt and Munich, Germany for software system design and testing. Also involved in the concept, design and technical marketing of proprietary enabling technology software products for SS7 and ISDN.

From: May 1986
To: May 1987
Organization: ADP, Inc.; Mt. Laurel, NJ
Title: Senior Software Engineer and Analyst
Summary: Responsible for the design and development of data communications and real time database application software for a host data center that provided real time financial information to large brokerage houses. Data communication protocol expertise in HDLC, RS-232 and IBM BiSync.

**Randall A. Snyder**
**Curriculum Vitae**

| | |
|---|---|
| From: | June 1984 |
| To: | May 1986 |
| Organization: | C3, Inc.; Cape May, NJ |
| Title: | Consulting Systems Analyst and Software Engineer |
| Summary: | Civilian consulting systems analyst and engineer to the U.S. Coast Guard Electronics Engineering Center (EECEN) for C3, Inc. Developed sophisticated database software for shipboard use including inventory and law enforcement applications. The work included the follow-through of the entire project lifecycle including writing of requirements, functional, design and program specifications, coding, debugging, alpha and beta testing, release, shipboard installation and continuing technical support of the product. Received a personal commendation from Admiral W.F. Merlin, Chief, Office of Command, Control and Communications, for successful efforts on these projects. |

## Professional Affiliations, Achievements & Awards

- Member, Mobile Multimedia Institute
- Nominated, Technology and Engineering Emmy Award for Outstanding Achievement in Advanced Media Technology, 2006

## Patents & Publications

### Issued Patents

| Patent | Date | Description |
|---|---|---|
| US 8,670,753 | 3/11/2014 | System and Method for Determining and Delivering Appropriate Multimedia Content to Data Communication Devices |
| Mexico 308720 B | 12/04/2013 | Sistema y Metodo para el Analisis Automatizado que Compara una Ubicacion del Dispositivo Inalambrico con Otra Ubicacion Geografica |
| US 8,588,748 | 11/19/2013 | System and Method for Mobile Identity Protection of a User of Multiple Computer Applications, Networks or Devices |
| US 8,437,784 | 05/07/2013 | System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System |
| US 8,374,634 | 02/12/2013 | System and Method for Automated Analysis Comparing a Wireless Device Location with Another Geographic Location |
| US 8,280,348 | 10/02/2012 | System and Method for Mobile Identity Protection Using Mobile Device Signaling Network Derived Location Pattern Recognition |
| US 8,155,677 | 04/10/2012 | Mobile Messaging Short Code Translation and Routing System |

| | | |
|---|---|---|
| | | and Method |
| New Zealand 580499 | 08/31/2012 | System and Method for Automated Analysis Comparing a Wireless Device Location with Another Geographic Location |
| US 8,131,262 | 03/06/2010 | System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System |
| US 8,116,731 | 02/14/2012 | System and Method for Mobile Identity Protection of a User of Multiple Computer Applications, Networks or Devices |
| Australia 2008/115299 | 02/09/2012 | System and Method for Automated Analysis Comparing a Wireless Device Location with Another Geographic Location |
| S. Africa 2009/06947 | 01/26/2011 | System and Method for Automated Analysis Comparing a Wireless Device Location with Another Geographic Location |
| US 7,792,518 | 09/07/2010 | System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System |
| US 7,403,788 | 07/22/2008 | System and Method to Initiate a Mobile Data Communication Utilizing a Trigger System |
| US 6,128,389 | 10/03/2000 | Authentication Key Management System and Method |
| US 5,970,144 | 10/19/1999 | Secure Authentication-Key Management System and Method for Mobile Communications |
| US 5,850,445 | 12/15/1998 | Authentication Key Management System and Method |
| US 5,799,084 | 08/25/1998 | System and Method for Authenticating Cellular Telephonic Communication |

## Published Patents Pending

| Patent Application | Date | Description |
|---|---|---|
| 20110202407 | 08/18/2011 | System and Method for Improving Internet Search Results Using Telecommunications Data |
| 20110154447 | 06/23/2011 | Systems and Methods for Authenticating a User of a Computer Application, Network or Device Using a Wireless Device |
| 20090204815 | 08/13/2009 | System and Method for Wireless Device Based User Authentication |
| 20080119210 | 05/22/2008 | Wireless Messaging Address System and Method |
| 20080114884 | 05/15/2008 | Centralized Mobile and Wireless Messaging Opt-Out Registry System and Method |
| 20060224943 | 10/05/2006 | Method and System to Automatically Publish Media Assets |

## Publications

1. What Workers Want from Wireless by Randall A. Snyder; April 15, 2004. America's Network, Advanstar Communications, Santa Ana, California USA.
2. Snyder, Randall A. and Gallagher, Michael D. Wireless Telecommunications Networking with ANSI-41 Second Edition; McGraw-Hill, New York, NY USA; © Copyright 2001 Randall A. Snyder and Michael D. Gallagher. *Foreword by Tom Wheeler, current Chairman, Federal Communications Commission.*

3. Forecasting SS7 Traffic by Randall A. Snyder; November 1, 2000. Wireless Review, Volume 17, Number 21, Intertec Publishing, Overland Park, KS USA.
4. Gallagher, Michael D. and Snyder, Randall A. Mobile Telecommunications Networking with IS-41; McGraw-Hill, New York, NY USA; © Copyright 1997 Michael D. Gallagher and Randall A. Snyder.
5. IS-41/GSM Interoperability by Randy Snyder; December, 1995, Cellular Networking Perspectives, Cellular Networking Perspectives, LTD, Calgary, Alberta, Canada.

## Citations

1. Commendation from Admiral W.F. Merlin, Chief, Office of Command, Control and Communications, USCG (1986)
2. Method and Apparatus for Routing Short Messages, US Patent #6308075, Issued October 23, 2001.
3. Mediation Software for Delivery of Interactive Mobile Messaging and Personalized Content to Mobile Devices. Patent Application # 20020120779, August 29, 2002.
4. Automatic In-Line Messaging System, US Patent #6718178, Issued April 6, 2004.
5. Method and System for Wireless Instant Messaging, US Patent #7058036, Issued June 6, 2006.
6. United States Court of Appeals for the Ninth Circuit. Satterfield v. Simon & Schuster, Inc. No. 07-16356, D.C. No. CV-06-02893-CW Opinion. Appeal from the United States District Court for the Northern District of California. Opinion by N.R. Smith, Circuit Judge. Filed June 19, 2009.

# Randall A. Snyder Curriculum Vitae

## Litigation Support Experience

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology
Law Firm: Keogh Law, Ltd.
Case Name: Johnson v. Yahoo! Inc.
Services Provided: Testifying expert for plaintiff
Disposition: Ongoing
Date: 2014

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology
Law Firm: Jacobs Kolton, Chtd.
Case Name: Nunes v. Twitter, Inc.
Services Provided: Testifying expert for plaintiff
Disposition: Ongoing
Date: 2014

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls
Law Firm: Manning Law, PLLC
Case Name: Manning v. Lendio, Inc.
Services Provided: Testifying expert for plaintiff
Disposition: Ongoing
Date: 2014

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology
Law Firm: The Law Offices of Joseph R. Manning, Jr.
Case Name: Vargem v. Tax Defense Partners, LLC
Services Provided: Testifying expert for plaintiff
Disposition: Ongoing
Date: 2014

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls
Law Firm: Steptoe & Johnson PLLC
Case Name: Cain v. Monitronics, International, Inc.
Services Provided: Consulting expert for defendant
Disposition: Ongoing

Date: 2014

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology and unlawful cellular telephone calls
Law Firm: Mantese Honigman Rossman and Williamson, P.C.
Case Name: Glassbrook v. Rose Acceptance, Inc. and First National Bank of America
Services Provided: Testifying expert, expert reports, depositions for plaintiff
Disposition: Ongoing
Date: 2014

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls
Law Firm: Kazerouni Law Group, APC
Case Name: Iniguez v. The CBE Group, Inc.
Services Provided: Testifying expert, expert reports for plaintiff
Disposition: Settled
Date: 2014

*Expert Engagement:*
Type of Matter: California Invasion of Privacy Act (Penal Code §§ 630) class action related to unlawful recording of telephone conversations
Law Firm: Keller Grover LLP and Law Offices of Scot D. Bernstein
Case Name: McCase v. Six Continents Hotels, Inc.
Services Provided: Testifying expert, expert reports for plaintiff
Disposition: Ongoing
Date: 2014

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls
Law Firm: Keogh, Cox & Wilson, Ltd.
Case Name: Heatherington v. Omaha Steaks, Inc.
Services Provided: Testifying expert for plaintiff
Disposition: Ongoing
Date: 2014

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology
Law Firm: Lemberg & Associates LLC
Case Name: Shiyan v. Lucille Roberts Health Clubs, Inc.
Services Provided: Testifying expert, expert reports for plaintiff
Disposition: Ongoing
Date: 2014

**Randall A. Snyder**
**Curriculum Vitae**

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Lemberg & Associates LLC |
| Case Name: | Meyer v. Receivables Performance Management LLC |
| Services Provided: | Testifying expert for plaintiff |
| Disposition: | Ongoing |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Lemberg & Associates LLC |
| Case Name: | Creel v. GC Services, L.P. |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Settled |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (patents) related to short message service (SMS) technology and communication protocols |
| Law Firm: | White & Case LLP |
| Case Name: | Nokia Corporation v. Google Inc. |
| Services Provided: | Testifying expert for defendant |
| Disposition: | Settled |
| Date: | 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Lemberg & Associates LLC |
| Case Name: | Horton v. Cavalry Portfolio Services LLC |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Ongoing |
| Date: | 2013 – 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Law Office of Scott D. Owens, Esq. and Farmer, Jaffee, Weissing, Edwards, Fistos & Lehrman, P.L. |
| Case Name: | Legg v. Voice Media Group, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Class certification denied |
| Date: | 2013 – 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Edelson LLC |
| Case Name: | Sterk v. Path, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2013 – 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Francis & Mailman, P.C. |
| Case Name: | Dominguez v. Yahoo! Inc. |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Ongoing |
| Date: | 2013 – 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | McGuire Law, P.C. |
| Case Name: | Smith v. Microsoft Corporation |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Ongoing |
| Date: | 2013 – 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Heyrich Kalish McGuigan, PLLC |
| Case Name: | Gragg v. Orange Cab Company, Inc., et al. |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Ongoing |
| Date: | 2013 – 2014 |

*Expert Engagement.*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Wooten, Kimbrough & Normand, PA |
| Case Name: | Murphy v. DCI Biologicals, LLC |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2013 – 2014 |

*Expert Engagement.*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action |

| | |
|---|---|
| | related to unlawful cellular telephone calls |
| Law Firm: | McGuire Law, P.C. |
| Case Name: | Murray v. Bill Me Later, Inc. |
| Services Provided: | Testifying expert for plaintiff |
| Disposition: | Settled |
| Date: | 2013 – 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Kazerouni Law Group, APC |
| Case Name: | Sherman v. Yahoo! Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2013 – 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 and Fair Debt Collection Practices Act (FDCPA) 15 U.S.C. 15 § 1692 related to unlawful cellular telephone calls |
| Law Firm: | Collins & Story, PA |
| Case Name: | Keen v. Delta Outsource Group, Inc. |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Ongoing |
| Date: | 2013 – 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (patents) related to short message service (SMS) technology and mobile banking |
| Law Firm: | Panovia Group LLP |
| Case Name: | N5 Technologies, LLC v. Capital One, N.A., et al. |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Settled |
| Date: | 2013 – 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 class action related to short message service (SMS) technology |
| Law Firm: | Hartmann and Kananen |
| Case Name: | Baird v. Sabre, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Dismissed |
| Date: | 2013 – 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action |

| | |
|---|---|
| | related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | Edelson LLC |
| Case Name: | Lee v. Stonebridge Life Insurance Company |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Settled |
| Date: | 2012 – 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (patents) related to short message service (SMS) technology and multimedia message service (MMS) technology |
| Law Firm: | Baker Botts LLP |
| Case Name: | Intellectual Ventures LLC v. AT&T Mobility LLC, T-Mobile USA, Inc., Sprint Spectrum L.P., US Cellular Corporation |
| Services Provided: | Testifying expert, expert reports for defendants |
| Disposition: | Ongoing |
| Date: | 2012 – 2014 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Keogh Law, Ltd. |
| Case Name: | Wanca v. LA Fitness International, LLC |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Settled |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Lemberg & Associates LLC |
| Case Name: | Penn v. NRA Group, LLC |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Ongoing |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Lemberg & Associates LLC |
| Case Name: | Reed v. GC Services LP |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Settled |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action |

| | |
|---|---|
| | related to short message service (SMS) technology |
| Law Firm: | The Lavery Law Firm |
| Case Name: | Volpe v. Caribbean Cruise Line, Inc. |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Dismissed |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Washington Consumer Protection Act, RCW 19.86 and RCW 80.36.400 related to unfair business practices and unlawful cellular telephone calls |
| Law Firm: | Williamson and Williams Law |
| Case Name: | Kids Northwest v. First Data Corporation |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Ongoing |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | George Rikos Law |
| Case Name: | Van Patten v. Vertical Fitness |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Ongoing |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 and California Business and Professions Code § 17200 class action related to short message service (SMS) technology |
| Law Firm: | Milberg LLP |
| Case Name: | D'Agostino v. Jesta Digital, LLC (dba Jamster) |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 and Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising 47 C.F.R. § 64.1200(d)(3) class action related to unlawful cellular telephone calls |
| Law Firm: | Burke Law Offices, LLC |
| Case Name: | Benzion v. Vivint, Inc. |
| Services Provided: | Testifying expert, expert reports, depositions for plaintiff |
| Disposition: | Ongoing |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action |

| | |
|---|---|
| | related to unlawful cellular telephone calls |
| Law Firm: | Lemberg & Associates LLC |
| Case Name: | Rutigliano v. Convergent Outsourcing, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Ongoing |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Kazerouni Law Group, APC |
| Case Name: | Emanuel v. The Los Angeles Lakers, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Dismissed |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology |
| Law Firm: | Kazerouni Law Group, APC |
| Case Name: | Barani v. Wells Fargo Bank, N.A. |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Settled |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (patents) related to wireless calling party identification technology |
| Law Firm: | K&L Gates LLP |
| Case Name: | Cequint Inc. v. Apple Inc. |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Settled |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Donald A. Yarbrough, Esq. |
| Case Name: | Mais v. Gulf Coast Collection Bureau, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls |
| Law Firm: | Donald A. Yarbrough, Esq. |

Case Name: Manno v. Healthcare Revenue Recovery Group, LLC
Services Provided: Testifying expert, expert reports, depositions for plaintiff
Disposition: Settled
Date: 2013

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers
Law Firm: Law Office of Scott D. Owens, Esq.
Case Name: Wojcik v. Buffalo Bills, Inc.
Services Provided: Testifying expert, expert reports for plaintiff
Disposition: Settled
Date: 2012 – 2013

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers
Law Firm: Law Office of Scott D. Owens, Esq.
Case Name: Keim v. ADF Midatlantic, LLC (Pizza Hut)
Services Provided: Testifying expert for plaintiff
Disposition: Ongoing
Date: 2012 – 2013

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful cellular telephone calls
Law Firm: Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP
Case Name: Connelly v. Hilton Grand Vacations Company, LLC
Services Provided: Testifying expert, expert reports, depositions for defendant
Disposition: Class certification denied
Date: 2012 – 2013

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology
Law Firm: Kirby Law Group
Case Name: Agne v. Papa John's International, Inc., et al.
Services Provided: Consulting expert for plaintiff
Disposition: Settled
Date: 2012

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action and NY GBL 399-P class action related to unlawful calls
Law Firm: Bellin and Associates LLC

Case Name: Tipoo v. Enhanced Recovery Company, LLC
Services Provided: Testifying expert, consulting expert, discovery motions for plaintiff
Disposition: Undisclosed
Date: 2012

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful calls
Law Firm: Burke Law Offices, LLC
Case Name: Bailey v. Household Finance Corporation, et al.
Services Provided: Testifying expert, expert reports for plaintiff
Disposition: Undisclosed
Date: 2011 – 2012

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology
Law Firm: Burke Law Offices, LLC
Case Name: Annoni v. FYISMS.com, LLC
Services Provided: Testifying expert, expert reports for plaintiff
Disposition: Undisclosed
Date: 2011 – 2012

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers
Law Firm: KamberEdelson, LLC
Case Name: Schrock v. Wenner Media LLC
Services Provided: Consulting expert for plaintiff
Disposition: Undisclosed
Date: 2011

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers
Law Firm: Summit Law Group
Case Name: Kramer v. Autobytel, Inc. and B2Mobile, LLC
Services Provided: Consulting expert for defendant
Disposition: Settled
Date: 2011

*Expert Engagement:*
Type of Matter: Intellectual property (patents) related to wireless location based services (LBS)
Law Firm: Mintz, Levin, Cohn, Ferris, Glovsky and Popeo PC
Case Name: Emsat Geolocation Technology, LLC v. CellCo Limited Partnership (dba

| | |
|---|---|
| | Verizon Wireless), et al. |
| Services Provided: | Consulting expert, USPTO affidavits for patent reexamination for plaintiff |
| Disposition: | Undisclosed |
| Date: | 2010 – 2011 |

*Expert Engagement*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful calls |
| Law Firm: | Keogh Law, Ltd. |
| Case Name: | Griffith v. Consumer Portfolio Services, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Undisclosed |
| Date: | 2010 – 2011 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful calls |
| Law Firm: | Keogh Law, Ltd. |
| Case Name: | Dobbin v. Wells Fargo Auto Finance, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Dismissed |
| Date: | 2010 – 2011 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (patents) related to short message service (SMS) technology |
| Law Firm: | Nelson Bumgardner Casto PC |
| Case Name: | Celltrace LLC v. AT&T Inc., et al. |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Undisclosed |
| Date: | 2010 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | California Constitution, Article VI, § 10, class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | VanDyke v. Media Breakaway, LLC |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2009 |

*Expert Engagement*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to unlawful calls |
| Law Firm: | Gordon & Rees LLP |
| Case Name: | Allen v. Rickenbacker Collection Services |
| Services Provided: | Consulting expert for defendant |
| Disposition: | Undisclosed |

Date: 2009

*Expert Engagement:*
Type of Matter: Intellectual property (trademarks) related to short message service (SMS) technology
Law Firm: Fish & Richardson P.C.
Case Name: Cricket Communications, Inc. v. HipCricket, Inc.
Services Provided: Testifying expert, expert reports, depositions for plaintiff
Disposition: Undisclosed
Date: 2008 – 2009

*Expert Engagement:*
Type of Matter: California Constitution, Article VI, § 10, class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers
Law Firm: KamberEdelson, LLC
Case Name: Albrecht v. mBlox, Inc., et al.
Services Provided: Testifying expert, expert reports for plaintiff
Disposition: Settled
Date: 2008 – 2009

*Expert Engagement:*
Type of Matter: Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 class action related to short message service (SMS) technology
Law Firm: Blim & Edelson, LLC
Case Name: Satterfield v. Simon & Schuster, Inc.
Services Provided: Testifying expert, expert reports for plaintiff
Disposition: Settled
Date: 2007 – 2009

*Expert Engagement:*
Type of Matter: Class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers
Law Firm: KamberEdelson, LLC
Case Name: Walker v. Motricity, Inc.
Services Provided: Testifying expert, expert reports, depositions for plaintiff
Disposition: Settled
Date: 2008

*Expert Engagement:*
Type of Matter: Class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers
Law Firm: KamberEdelson, LLC
Case Name: Rynearson v. Motricity, Inc.
Services Provided: Testifying expert, expert reports, depositions for plaintiff
Disposition: Settled
Date: 2008

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | California Constitution, Article VI, § 10, class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Reed v. Sprint Nextel Corporation |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2008 |

*Expert Engagement*

| | |
|---|---|
| Type of Matter: | Class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Paluzzi v. CellCo Limited Partnership (dba Verizon Wireless) and mBlox. Inc. |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Settled |
| Date: | 2008 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Nava v. Predicto Mobile, LLC |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Settled |
| Date: | 2008 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | McFerren v. AT&T Mobility, LLC |
| Services Provided: | Consulting expert for plaintiff, settlement agreement |
| Disposition: | Settled |
| Date: | 2008 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Guerrero v. MobileFunster, Inc. |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Settled |
| Date: | 2008 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Computer Fraud and Abuse Act, 18 U.S.C. Article § 1030, class action related to |

| | |
|---|---|
| | short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Gray v. Mobile Messenger Americas, Inc. |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Settled |
| Date: | 2008 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Goddard v. Google, Inc. |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Settled |
| Date: | 2008 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Duffy v. Nevis Mobile, LLC |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Settled |
| Date: | 2008 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Criswell v. MySpace, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2008 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332, 1453 and 28 U.S.C. § 1367(a) class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Bradberry v. mBlox, Inc. |
| Services Provided: | Consulting expert, damage estimates for plaintiff |
| Disposition: | Settled |
| Date: | 2008 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | California Constitution, Article VI, § 10, class action related to short message |

| | |
|---|---|
| | service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Ayers v. Media Breakaway, LLC |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2008 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (patents) related to wireless location based services (LBS) |
| Law Firm: | Hahn Loeser & Parks, LLC |
| Case Name: | Emsat Geolocation Technology, LLC v. CellCo Limited Partnership (dba Verizon Wireless), et al. |
| Services Provided: | Consulting expert for plaintiff |
| Disposition: | Undisclosed |
| Date: | 2008 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | Blim & Edelson, LLC |
| Case Name: | Valdez v. Sprint Nextel Corporation |
| Services Provided: | Consulting expert, damages estimate for plaintiff |
| Disposition: | Settled |
| Date: | 2007 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 201 class action related to short message service (SMS) technology and unlawful charging of cellular telephone customers |
| Law Firm: | Blim & Edelson, LLC |
| Case Name: | Bradberry v. T-Mobile USA, Inc. |
| Services Provided: | Testifying expert, expert reports, numerosity for class certification for plaintiff |
| Disposition: | Settled |
| Date: | 2007 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | California Computer Crime Law, Cal. Pen. Code § 502 and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 class action related to short message service (SMS) technology |
| Law Firm: | KamberEdelson, LLC |
| Case Name: | Abrams v. Facebook, Inc. |
| Services Provided: | Testifying expert, expert reports for plaintiff |
| Disposition: | Settled |
| Date: | 2007 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Intellectual property (patents) related to short message service (SMS) technology |

| | |
|---|---|
| Law Firm: | Paul Hastings LLP |
| Case Name: | TeleCommunication Systems, Inc. v. Mobile365, Inc. |
| Services Provided: | Testifying expert, expert reports, depositions, trial testimony for defendant |
| Disposition: | Settled |
| Date: | 2007 |

Wireless Research Services



# Wireless Research Services, LLC

## 2014 Rate Sheet

| ITEM | FEE |
|---|---|
| Non-refundable Retainer at Time of Engagement | $4,000 |
| Expert Witness Consulting, Expert Reports | $450 per hour |
| Depositions, In-court Testimony | $500 per hour |
| Required Travel, Lodging, Board and Administrative Expenses | $1,000 per airline travel day plus actual incurred expenses |
| Invoicing | Payment due upon receipt |
| Penalty for Late Payments | 10% of total invoice added after each 30 days late until full payment is received |

By signing below and returning an executed copy to Wireless Research Services, LLC along with payment of the non-refundable retainer, you agree to the payment terms contained on this rate sheet.

Agreed to by:______________________________

Law firm/Company:__________________________

Case Name:_______________________________

Date:____________________________________

# EXHIBIT B

# Retention Periods of Major Cellular Service Providers

Prepared by the Computer Crime and Intellectual Property Section, U.S. Department of Justice, (202) 514-1026, and FBI's Cellular Analysis Survey Team

| | Verizon | AT&T | Sprint/Nextel** | T-Mobile |
|---|---|---|---|---|
| Subscriber Information | Post-paid: 3-5 years* | Depends on length of service | Unlimited | 5 years |
| Call detail records | 1 year | Pre-paid: varies<br>Post-paid: 5-7 years | 18 mo. (approx.) | Pre-paid: 2 years<br>Post-paid: 5 years |
| Cell towers used by phone for calls | 1 year | From July 2008 | 18 mo. (approx.) for Sprint CDMA devices; 18-24 months for Nextel iDEN devices | 6 months |
| Text message (SMS) records | 1 year | Post-paid: 5-7 years | 18 mo. (approx.) for Sprint CDMA devices; not available for Nextel iDEN devices | Pre-paid: 2 years<br>Post-paid: 5 years |
| Text message (SMS) content | 3-5 days (never more than 10) | Not retained | Not retained | Not retained |
| Cell towers used for SMS transmission | Not retained | 1 year | Varies | 180 days |
| Pictures (MMS) | PixPlace only (customer can add or delete pictures any time) | Not retained | Contact provider | Can be stored online. Retained until deleted, or until service is canceled or suspended. |
| IP session information | 1 year | 72 hours maximum | 18 mo. (approx.) | Not retained |
| IP source & destination information | 90 days | 72 hours maximum | 6 mo. (approx.) | Not retained |
| Bill copies (post-paid only) | 3-5 years, but only last 12 months readily available * | 5-7 years | 7 years | Pre-paid: 2 years<br>Post-paid: 5 years |
| Payment history (post-paid only) | 3-5 years, check copies for 6 months* | Depends on length of service | Unlimited | 5 years |

- May vary by former company.

** For records older than mid-November 2007, Sprint can only provide bill reprints with outgoing info.

# Retention Periods of Major Cellular Service Providers

Prepared by the Computer Crime and Intellectual Property Section, U.S. Department of Justice, (202) 514-1026, and FBI's Cellular Analysis Survey Team .

| | TracFone | Cricket | MetroPCS | US Cellular |
|---|---|---|---|---|
| Subscriber Information | 2 years | 18 months | 6 months minimum | 7 years |
| Call detail records | 2 years | 6 months | 6 months | 1 year |
| Cell towers used by phone for calls | Not available | 6 months (?) | 6 months | 1 year |
| Text message (SMS) records | Not available | Phone-to-phone: Not retained<br>Web-to-phone: 3 mos. | 60 days | 1 year |
| Text message (SMS) content | Not available | Phone-to-phone: Not retained<br>Web-to-phone: 3 mos. | 60 days | 3-5 days |
| Cell towers used for SMS transmission | Unknown | Not retained | Not retained | Not retained |
| Pictures (MMS) | Not available | Not retained | Not retained | Unknown |
| IP session information | 30 days | Not retained | Not retained | 1 year |
| IP source & destination information | 30 days | Not retained | Not retained | Unknown |
| Bill copies (post-paid only) | Not available | Unknown | Unknown | 7 years |
| Payment history (post-paid only) | Life of the phone | Unknown | Unknown | 1 year |



Law Enforcement Use Only

# EXHIBIT C

Subpoena Compliance
Sprint Corporate Security
michelle.2.bersbach@sprint.com

Enclosures

*Earlier this year Sprint Nextel changed to Sprint Corporation. Effective October 1, 2013 Sprint will no longer accept legal demands directed to Nextel Communications. Please direct all future legal demands to Sprint Corporation. Thank you for your cooperation.

*Please note, records for the iDEN network do not exist after 7/2/13 as the network was decommissioned.

*Notice: If the records contained in the attached package are utilized in trial proceedings, and if you require a records custodian for authentication, be advised Sprint does not have local representatives. Sprint's Trial Team is located at our Corporate Headquarters in Overland Park, Kansas. You will need to contact the Trial Team at CSTrialTeam@Sprint.com or call our office at 800-877-7330. Our office will require at least two-weeks notice in addition to pre-paid travel arrangements by your office.

*Search results indicate one or more of the numbers listed on the above-referenced legal demand may belong to Boost, a Sprint prepaid phone service. Our office maintains subscriber information for Boost accounts, but this information is often inaccurate or incomplete, as no identification is required when purchasing a Boost phone. Payment information is also available for Boost accounts. However, this information, while accurate, may not be complete. As Boost accounts are prepaid, no bill reprints are available. We are able to provide call detail records for iDEN and CDMA Boost accounts for the most recent 18-24-month period.

Dear Requestor,

Due to a change in Sprint company standard, Sprint Legal Compliance will be converting our call detail and cell site reports to show "NEID" instead of "Repoll". NEID stands for Network Element Identifier. To accommodate our requestors during this transition, we will keep both the Repoll and NEID numbers in the call detail and cell site spreadsheets. After this time, we will only be providing the NEID numbers on these reports. We apologize for any inconvenience and confusion this may cause in the transition period.

Sincerely,
Sprint Legal Compliance

## Key to Understanding CDMA Call Detail Reports

**Calling number:** This column reflects the number placing the call (the individual who initiated the call). If the call is an outgoing call, this will be the Sprint PCS target number.

**Called number:** This column reflects the number actually called. In most cases this number will be the same as the number in the "Dialed Digits" column. If the number has been forwarded, or if there is a routing number, then this will be reflected. If the number has a 11 in front of the area code, that means the call rolled to voicemail and was NOT answered by the customer.

**Dialed digits:** This column reflects the digits that the caller enters into the keypad of the phone. If the call is an incoming call, this will be the Sprint PCS target number.

**M_R #:** Mobile Role (Type of Call). Listed as outgoing, incoming, routed call or undetermined.

**Start Date:** Date and time the call was initiated.

**End Date:** Date and time the call was ended.

**Duration:** Duration of call, in seconds.

**NEID:** This reflects which network element handled the call.

**Repoll number:** This reflects which phone switch handled the call.

## Key to Understanding CDMA Call Detail Reports, cont.

*Routed calls come in two main varieties. The first, also known as Temporary Local Directory Number (TLDN). They may be considered to be bridge/router numbers to complete a call. The second is when a call in not answered, but is routed to voicemail. Calls routed straight to voicemail will also have an "11" before the number indicated in the "Called_Nbr" column. For handsets using visual voicemail, these numbers may replace the "11" in the called number column: (800) 877-2400, (866) 677-8204, (866) 222-2604, and (877) 836-4746 The indicator that Sprint's Visual Voicemail platform was used within the session appears as 624500000XXXXXXX.

*The CDMA call detail report may indicate the sending and receipt of text messages and e-mail. While not flagged as text messages, the line will indicate no duration, the dialed digits column will either be blank or will show an e-mail address, and the repoll column may contain one of the following numbers: 13; 291-298; 347; 506-533; 681-684; 686-688. NEIDs 191-198 226-229 291-294

* On the CDMA network, Sprint maintains Gateway and SWAT (Soft Wireless Access Tandem) networks in areas where there are large Sprint customer populations. These provide the required extra space that helps Sprint maintain all of the calls. When a call moves through a gateway or SWAT cell site information is not retained and is not recoverable. NEIDs for Gateways 124-125, NEIDs for SWATs 96, 184-190, 263, 363-365

*Please be advised that as of October 12, 2010, all CDMA CDR (Call Detail Record) text message time stamps are kept in Central time zone. Records prior to October 12, 2010 are either in Central or Eastern time zone. Sprint is unable to determine which time zone is reflected in records older than October 12, 2010.

*Short codes, also known as short numbers, are special telephone codes, significantly shorter than full telephone numbers, which can also be used to address SMS and MMS messages from mobile phones or fixed phones. Short codes are often associated with automated services. An automated program can handle the response and typically requires the sender to start the message with a command word or prefix. A list of short codes is not maintained by Sprint as number of short codes is extensive and constantly growing. **Example of a short code**- the customer may want updates pertaining to their favorite sports team. The customer would sign up with that team in order to receive text message updates relevant to the team.

## Key for Understanding Sprint Direct Connect Reports

**Client Address**- The non iDEN Direct Connect/Push to Talk address of the client.

**Total Active Talk Duration**- The cumulative active time for the client in seconds

**Call GMT Start Timestamp**- The starting time of the call in GMT time

**Call GMT End Timestamp**- The end time of the call in GMT time

**Record Id**- Identifies the records structure

CDR (Call Detail Record)

CATT (Call Attempt)

CAVT (Call Availability)

CALT (Call Alert)

**Call Id**- Sprint Direct Connect identifier for the chat session. Together with the File Sequence Number and the Output Sequence Number these three fields group Sprint Direct Connect call sessions with their participants

**Member Type Code**- this record indicates if the Client Address was the originator or a participant in the session

O for Originator

P for Participant

**File Sequence Number**- Each incoming file has a sequence number that is used to uniquely identify records along with the record number within the file. Together with the Call Id and the Output Sequence Number these three fields group Sprint Direct Connect call sessions with their participants

**Output Sequence Number**- Uniquely identifies the record within the Sprint Direct Connect report. Together with the Call Id and the File Sequence Number these three fields group Sprint Direct Connect call sessions with their participants

**Initial Conference Id**- For CALT, CAVL and CATT this is the conference id system assigned initial conference id

**Ending Conference Id**- For CALT, CAVL and CATT this is the conference id system assigned ending conference id

**Duration (sec)**- Cumulative participation time for this participant in seconds

## Key for Understanding Sprint Direct Connect Reports

**Last Reason Participant Left Code**- The reason why the participant last left the call

0 for an unknown reason

1 for the client terminated its session by sending a request to leave the group (End)

2 for the call was ended by the server

3 for the client could not be contacted

4 for the client did not participate in the call

5 for some system error ended the client's session

**Call Originator Source SIP URI**- the SIP URI of the device originating the session

*SIP stands for Session Initiation Protocol and it is everything before the @ in the email address

*URI stands for Universal Resource Locator and it is everything after the @ in the email address

## CDMA Network Changes

Changes are currently taking place to Sprint's CDMA network due to the addition of new network elements and new technologies. During this time, there may be some incongruity on call reports. Sprint's Engineering Department is currently engaged on these issues.

## Network Vision

The technology used by the Network Vision is an advancement upon the existing Sprint 3G network. Part of the Network Vision Plan is to create additional and convert pre-existing cell towers to support the network traffic. Sprint is currently updating/adding new switches and cell sites. Network Vision will provide a better experience for Sprint customers.

During this time of continual change with the Sprint CDMA network, Sprint Legal Compliance will provide requestors with cell towers that are listed as "pending" along with towers that are listed as "active" on the Sprint cell site lists. Cell site lists are updated monthly. Therefore, sites that state "pending" may actually be "active" at the time records/cell site lists are released.

Current Vision Network Elements are:

| Location | NEID | Repoll | Location | NEID | Repoll | Location | NEID | Repoll |
|---|---|---|---|---|---|---|---|---|
| Akron OH | 422 | 93 | Ft Worth TX | 434 | 28 | Nashville TN | 441 | 36 |
| Atlanta GA | 431 | 24 | Hawaii | 449 | 48 | Norfolk VA | 445 | 41 |
| Atlanta GA | 440 | 35 | Houston TX | 423 | 94 | Omaha NE | 429 | 26 |
| Bayamon PR | 425 | 4 | Houston TX | 435 | 29 | Orlando FL | 438 | 33 |
| Bayamon PR | 426 | 5 | Kansas City MO | 432 | 25 | Orlando FL | 439 | 34 |
| Buffalo NY | 427 | 11 | Kansas City MO | 443 | 38 | Phoenix AZ | 442 | 37 |
| Charlotte NC | 444 | 39 | Miami FL | 437 | 31 | Richmond VA | 448 | 47 |
| Cheyenne WY | 428 | 13 | Morrisville NC | 446 | 42 | Stockton CA | 424 | 3 |
| Chicago IL | 420 | 72 | Morrisville NC | 447 | 43 | Tacoma WA | 430 | 20 |
| Ft Worth TX | 433 | 26 | Nashville TN | 436 | 30 | | | |

***Not all network elements are currently active. ***

## FAQ's:

I. Akron, Ohio is currently working in tandem with the Chicago Vision Repoll.

A. The time zone indicated in the CDR (call detail records) will be derived from the switch. Therefore, the time stamps for call detail records with Repoll 93/NEID 422 (Akron switch) will reflect the Eastern Time Zone and the time stamps for call detail records with Repoll 72/NEID 420 (Chicago switch) will reflect the Central Time Zone.

## 4G Data

Sprint is also investing in 4G data services speeds with both LTE and WiMax. The network is always looking for the best possible service for customer handsets, tablets and data cards. With that said, IP connection records may be produced from one of three reports. These reports are called:

3G IPDR- third generation data provided on handsets, tablets and data cards

WiMAX- fourth generation data which provides faster data retrieval to Sprint customers

LTE/eHRPD- LTE is another type of fourth generation data. LTE stands for Long Term Evolution eHRPD is a process that helps assist in the handoffs from one data technology to another.

Currently, 4G data connections are used by Sprint customers that have Smart phones (such as Android and iPhones) and data cards. As technology advances more and more handsets will be 4G data capable. Web Traffic reports (a report that provides the website address visited by a Sprint customer) are available only for handsets that are 2G capable.

**Sprint**
Corporate Security
Mailstop: KSOPHM0206
6480 Sprint Parkway
Overland Park, KS 66251
913-315-0660
Fax: 816-600-3111

## Star Codes

Your request has been fulfilled, at least in part, by what is known as a CDMA CDR Report. A CDMA CDR Report lists information about incoming/outgoing calls including the digits dialed on the handset. As a dialing shortcut, PCS subscribers may use star codes (an asterisk (*) plus a short number sequence) when using our wireless telephones. On call detail reports the star may be indicated by a letter "B". This code will appear in the dialed digits column of the CDMA CDR Report. Following is a list of the most common star codes. Additional star codes may exist in the market from which the call is made. Please contact the Subpoena Compliance Group at the number listed above for more information concerning star codes.

*18 - Ping the nearest tower, call delivery activate
*180 - Call delivery deactivate
*2 - Customer Care
*3 - Payment Center
*31 - Three Way Calling
*4 - Account information
*5 - Spanish Customer care
*67 - Caller ID block
*68 - Override caller ID block
*70 - Cancel call waiting for that call
*711 - Customer Care
*72 - Activates call forwarding
*720 - Deactivates call forwarding
*73 - Call forwarding no answer
*74 - Call forward busy
*811 - Customer Care
*82 - Override caller ID block- for that call
*911 - 911
*073 - Cancel call forward no answer
*074 - Cancel call forward busy

Other numbers which may appear in the dialed digits column:

411 - Directory assistance
611 - Customer Care
711 - Telecommunications Relay Service(hearing impaired)
911 - Can also dial 0911 or 1911)
c777 - Web Browsing (SINS)

## RECEIVING RECORDS IN ELECTRONIC FORMAT

Your request has been satisfied, at least in part, by records furnished on compact disc (CD) or via e-mail. Sprint uses CDs when the response is particularly voluminous or if records are requested in electronic format. Once "recorded" the CD cannot be deleted, re-recorded or appended. Information on CD is normally in one of three formats:

RICH TEXT FORMAT (RTF)

These files are text files readable by any word processor such as Microsoft Word/Works or WordPerfect. Generally, we use this format for letters, summaries and explanatory documents. To retrieve these documents, open your word processor of choice then use the open file command (normally listed under File in the Window Menu bar). Navigate to the drive containing the CD and double click on the file name. While you may not manipulate the file and re-save directly on the CD, it may be manipulated and re-saved elsewhere.

SPREADSHEET FILES (XLS or CSV)
These files are normally used for longer items such as the call detail reports or a listing of all cell sites associated with a particular switch/repoll. We use Microsoft Excel to generate these files and recommend that product for viewing them. To retrieve these documents, open your spreadsheet program of choice then use the open file command (normally listed under File in the Window Menu bar). Navigate to the drive containing the CD and double click on the file name. These files may be uploaded to products such as PenLink in either CSV or XLS format. Please see your program documentation for assistance. While you may not manipulate the file and re-save directly on the CD, it may be manipulated and re-saved elsewhere.

TAGGED IMAGE FORMAT (TIF or TIFF)
This format is used for stored bills and for print outs from our customer service/billing system. All Windows based machines come with TIF viewers but accessing the viewer software may be unfamiliar. To retrieve these documents, open the My Computer folder on your desktop or Open the Windows Explorer (not Internet Explorer). Navigate to the drive containing the CD and **RIGHT** click on the file name. This will open a menu. Choose "OPEN WITH." A new dialog box will open. Look for applications that do Imaging. The most common are "Imaging", "Imaging Preview", "Microsoft Imaging", "Kodak Imaging" and Microsoft Office Document Imaging." Single click on your choice and also click on the check box which says, "Always use this program to open these files." This will set the program as your default and next time you need to open a TIF file, you may just double click on the desired document. Once open, most TIF viewers only display the current page. To go to the next page, use the page up/down keys on your computer keyboard or look for helper arrows. You may also wish to peruse the Help feature offered in every Windows based program. Please note: these files may not normally be uploaded to products such as PenLink since they are not open for manipulation. Please see your program documentation for assistance.

You may also receive files in a bundled, WinZip format (ZIP). These files contain other files (of the three types listed above). Zipped files are used to save space on particularly large requests. To open a ZIP file, open the My Computer folder on your desktop or Open the Windows Explorer (not Internet Explorer). Navigate to the drive containing the CD and double click on the file name. If this does not work, return to the folder containing your document and **RIGHT** click on the file name. This will open a menu. Choose "OPEN WITH." A new dialog box will open. Look for applications that do zipping. The most common is "WinZip." Single click on your choice and also click on the check box which says, "Always use this program to open these files." This will set the program as your default and next time you need to open a ZIP file, you may just double click on the desired document.

Please feel free to contact the Sprint Subpoena Compliance Department for further assistance: 800-877-7330.

# EXHIBIT D

at&t

Please refer to the legend below that explains the columns and the information displayed on the attached report.

## LEGEND FOR AT&T MOBILITY RECORDS LABELED "DATA SOURCE: SCAMP"

The attached file is being sent in a text file format to provide you with the ability to download into your data analysis system.

Once downloaded into an EXCEL format, header information will appear at the top displaying the AT&T 6-digit file number, creation date, the AT&T database source, date the report was run, and the account number of the target.

You may receive up to 3 separate reports for usage: Voice, Data and SMS. This is indicated at the beginning of each report. The fields you will find on usage reports are as follows:

VOICE:
**Conn. Date and Conn. Time:** The date and time the call was actually connected.
**Seizure Time:** The number of minutes and seconds it took from the time the 'Send' button was pressed to the time the call was connected to the network.
**Originating Number:** If target number appears in this field, the call is an outgoing call and the called number is in the Terminating Number field.
**Terminating Number:** If target number appears in this field, the call is an incoming call and the caller's number is in the Originating Number field. In rare instances, you may see all *** in this column. This is an indication that an invalid number was entered.
**Elapsed Time:** Number of minutes and seconds of the call between the connection time and the end of the call, also known as call duration. Does not include seizure time.
**Number Dialed:** This column represents the number that was actually dialed by the calling party or the voicemail access number if the call was forwarded to voicemail.
**IMEI:** International Mobile Equipment Identification number.
**IMSI:** International Mobile Subscriber Identity number.
**Description:** This field uses 2 key characters that describe the parties involved and a short description suffix key word that describes what is known about how the call was handled. Outbound calls will always be described as "DIR". "M" indicates the presence of an AT&T Mobility number. "m" indicates the presence of another wireless carrier's number. The number "2" will always be shown in the middle of the two characters and is used in lieu of "to". For example, M2O means AT&T Mobile "to" a Non-Mobile Phone Number. This report will not show routing by the receiving side of an outbound call. The tables below describe the potential values.
**CIC:** Stands for Carrier Identification Code. The number in this column translates to identifying the interexchange carrier of the call. A public listing of CIC codes can be found at the following url: http://www.nanpa.com/reports/reports_cic.html
**Call Code:** Represents the type of call that was processed on the wireline network. Call Code information can be obtained from the AskCalea website. If the LEA does not have access to AskCalea, please contact 1-855-532-2532

**Key Character Definitions**

| Field | Description |
|---|---|
| M | AT&T Mobile Phone (based on billing validation) |
| m | Other Carrier Mobile Phone (based on billing validation) |
| O | Non-Mobile Phone Number |

Calls will have 4 potential "suffix" descriptions.

**Description Suffix Definitions**

| Field Suffix | Description |
|---|---|
| DIR | Outbound calls will display DIR except for voicemail checks directly from the handset (VMC).<br>Inbound calls will display DIR if no forwarding took place.<br>Either the phone was answered or rang and was not answered. |
| VMC | Call was from handset to check Voicemail box. |
| VMB | Call was routed to VoiceMail number. |
| FWD | Call was forwarded to another number. |
| | Forwarding action could not be determined. |

A call described as "m2M_DIR" would be interpreted as a call from another carrier's mobile phone to an AT&T mobile phone that was not forwarded. For example, the call was not routed to voicemail. A call described as "O2M_FWD" would be a call from a non-mobile phone number to an AT&T mobile number that was forwarded to the number listed in the Terminating Number field.
**Cell Location:** Column only displays if location information was requested. The first two numbers indicate the beginning and ending LAC/CID information followed by the longitude/latitude and the azimuth (center point of the sector) of all cell sites that serviced the call. If the target was traveling, you may see more than one cell site in this field which will indicates hand offs while the call is in progress.

at&t

**DATA USAGE:**
The Data report displays many of the same columns as on the other reports, but also includes:
**Bytes Up:** The number of bytes sent from mobile station to the network.
**Bytes Dn:** The number of bytes from the network to the mobile station.
**Access Pt:** Displays the network interface access point.
**Cell Location:** Column only displays if location information was requested. Same information is displayed as noted above.

**SMS USAGE:**
**Originating Number:** If target number appears in this field, the SMS is outgoing and the receiving number is in the Terminating Number field.
**Terminating Number:** If the target number appears in this filed, the SMS is incoming and the number initiating the SMS is in the Originating Number filed.
**Description:** This field describes the direction of the message and a short description that describes what is known about the type of message. Outbound calls will always be described as "OUT" with no suffix description, and inbound messages will provide a description when it is known.

**Key Prefix Definitions**

| Field | Description |
|---|---|
| IN | Inbound Message |
| OUT | Outbound Message |

**Description Suffix Definitions**
**(These are ALL SYSTEM GENERATED MESSAGES)**

| Field Suffix | Description |
|---|---|
| VMN | VoiceMail message is waiting notification |
| VMP | VoiceMail box has been accessed notification. |
| VMA | Indicates either a voice mail notification or accessed notification. |
| AGM | General notification message from AT&T (time to add credit etc.). |
| ACB | Account Balance check response. |
| ACM | Account minutes available check response. |
| ACD | Account data used check response. |
| MMS | Multi Media Service |

A message described as "IN_VMP" would be interpreted as an inbound system message to the phone notifying the user that the voicemail box has been checked. A message labeled as "IN_ACB" means the user requested an "Account Balance Check" and the reply was received by the phone.
**Cell Location:** The first two numbers indicate the beginning and ending LAC/CID information followed by the longitude/latitude and the azimuth (center point of the sector) of all cell sites that serviced the call. If the target was traveling, you may see more than one cell site in this field.

**NOTE: If you requested call records and the target subscriber's device is an iPhone with the most current operating system (iOS 5 or above) and they send a text message to another device with the iOS 5 (or above) operating system, text messages between these devices will not appear in the detail records we have provided. This is because these text messages are delivered via the iMessage service through Apple. If the iMessage transaction occurred on the AT&T network, AT&T only captures the transaction as a data session and no other transactional information is stored or available.**

# EXHIBIT E

verizon wireless

## Explanation Form For Calls With Cellsites

| SWITCH | DATE | TIME | ORIG C/G | TERM C/G | DIR | MDN | CALLED # | CPN | SZR |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| This is the switch that the call is hitting off of | This is the date of the call | This is the start time of the call | This is valid cell site for outgoing calls. **Valid only on MO calls** | This is valid cell site for an incoming call. **Valid only on MT calls** | MO=Outbound call | This is your target # | If the call was an out going call=then the outgoing # that your target dialed will be in this column | This is the calling party # | This is the duration of the call in seconds |
| | | | | | MT=Incoming call | | If the call was an incoming #=then your target # will appear this column | If the call was an outgoing call=then your target # will be in this column | |
| | | | | | MF=Incoming call to voicemail-In rare cases, it could be mobile forwarding | | | If the call was an incoming call=then the incoming # to your target will appear in this column | |
| | | | | | MM=Mobile to Mobile call | | | | |
| | | | | | LL, CN, TR all pertain to routing information and will not be relevant to your investigation | | | | |

**Codes:**

*86 is voicemail retrieval
#225 is checking account balance
#646 is checking minutes
#777 is data/web services
#738 is prepaid voicemail retrieval
#729 is adding minutes for prepaid
*67 is used to block the mobile #
*82 is used to unblock the mobile #

verizon wireless

## Explanation Form For Historical Records

| Network Element name | Mobile Directory Number | Dialed Digit Number | Call Direction | Seizure Dt Tm | Seizure Duration | First Serving Cell Site | Last Serving Cell Site | Calling Party Number |
|---|---|---|---|---|---|---|---|---|
| This is the switching equipment that transacted the call. A switch is named by the basic geographic area it covers. Switches rout calls for hundreds of cell sites. | This is your target # | This is the number dialed to initiate the call. For inbound calls this number will be the same as the CUST ACCT column and for outbound calls this is the number your target dialed. | This is the type of call, e.g. inbound, outbound, or voicemail.<br>Inbound calls display the following numbers: 0 & 6. Calls to voicemail display the letter "F."<br>Outbound calls display the following numbers: 1 & 3<br>Mobile to Mobile calls do not capture cell sites and display the number 2. Any other letter or number is a routing or unknown call type and does not detail actual transactional data for a completed call. | This is the exact date and time of the start of each call | This is the duration of the call in seconds | This is the cell site # for OUTGOING calls ONLY | This is the cell site # for INCOMMING calls ONLY | This is the calling party that initiated the call. If the call is outbound this column will be the same as the CUST ACCT number. If the call is inbound, this is the number that dialed your target. |

Codes:

*86 is voicemail retrieval
#225 is checking account balance
#646 is checking minutes
#777 is data/web services
#738 is prepaid voicemail retrieval
#729 is adding minutes for prepaid
*67 is used to block the mobile #
*82 is used to unblock the mobile #

# EXHIBIT "B"

# In The Matter Of:

*LAURA McCABE and LATROYA SIMPSON*
*v.*
*SIX CONTINENTS HOTELS, INC.*

---

## *SNYDER, RANDALL A. - Vol. 1*
*July 23, 2014*

---

MERRILL CORPORATION
LegaLink, Inc.
20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LAURA McCABE and LATROYA SIMPSON, individually and on behalf of a class of similarly situated individuals, | ) | Case No. |
| Plaintiffs, | ) | 3:12-cv-04818-NC |
| vs. | ) | |
| SIX CONTINENTS HOTELS, INC; and DOES 2 through 10, inclusive, | ) | Pages 1 - 121 |
| Defendants. | ) | |

DEPOSITION OF RANDALL A. SNYDER

WEDNESDAY, JULY 23, 2014

9:26 A.M.

Reported by: JANET C. TRIMMER, RPR, CRR,

CA CSR No. 4008, NV CCR No. 864

"Based on my education, knowledge, experience, expertise and training, it is my expert opinion that the proposed class [sic] members of the class in this case can be definitively and clearly ascertained based solely on their cellular telephone numbers."
Do you see that?
A. Yes.
Q. What is the proposed class in this case?
A. I just understand that it is a class action lawsuit, and I was asked to opine on the ability to identify individuals by a cell phone number that are potentially members of the class, I assume, if it gets to that point in the case.
Q. Okay. Just so we're clear, as you sit here, do you know what the actual proposed class is in this case, the definition?
A. No.
Q. So when you say in paragraph 26 that the "proposed members of the class can be definitively and clearly ascertained based solely on their cellular telephone numbers," how can you make that conclusion if you don't know what the class definition is?
A. I was told by plaintiffs' counsel that the proposed members of the class were those people with

cellular telephone numbers that apparently had called in for some promotion to defendants, and that's all I know. So they basically described it to me that way.
I'm certainly not an expert in the law or in class action litigation; so I simply couched that statement based on what I was told by the attorneys.
Q. So can you explain to me step by step how you would definitively and clearly ascertain those class members based solely on their cellular telephone numbers?
A. Yes.
Q. Go ahead.
A. The first step would be to filter whatever list of telephone numbers was obtained, however it was obtained for this case, through what's called a "number portability database." There's really two of them in the country, two primary ones, Neustar and Telcordia. Neustar is by far the most popular that all the major carriers use.
There are many third party information service companies that lease access to Neustar's database, and that database is updated daily based on information coming from the carriers, landline and cellular. So on any given day you can determine whether a given number is a cellular number or a

about finding the identity or the subscriber associated with that number.

The first way may be to subpoena the carriers, who keep subscriber records for some period of time. There is no standard. So they may or may not have that information in a given period of time. By subscriber data I mean contact information, address, etc., billing address, that type of information.

If the carriers don't have it, there are information service companies included with the ones that access the number portability database that have as a business to cross-reference and correlate and analyze data from many sources just for many commercial reasons.

Some of them are administration of class actions, notification, that type of thing. Others are for determining demographic lists of leads for telemarketing companies. There's just a variety of commercial services.

So what they can do is, once they know the carrier and the telephone number, they can potentially cross-reference lists from information; LexisNexis, for instance, which is in the business of obtaining and maintaining individual data on people and things

for many, many, many years.
So, providing them with a number, or LexisNexis, along with many other companies -- there is one called NEXA Group. There's several out there -- you can give them a telephone number and they could search all their records, whether it's credit information, Experian information, DMV records, whatever any organization may have on file with that telephone number, and then cross-correlate that to obtain the individual that was associated with that number at that time.
Q. Does that give you the subscriber or the actual person using the phone?
A. That would -- well, it depends. It will always give you the person who is responsible for paying the account -- right? -- in general, from the carrier's perspective. You give it to the carriers to subpoena; they will give you the person who is paying for the account.
However, let's take an instance where maybe there's a family plan with parents and two teenagers. If -- if the number is of a teenager that might be part of this class for some reason, it depends on whether they've used that phone number for any type of, you know, public usage; right? Did they sign up

identity, to ascertain the identity of an individual associated with a phone number.

MR. TOTINO: Let me mark as Exhibit 2 the notice of motion for class certification.

(Exhibit 2 was marked for identification by the Certified Court Reporter.)

BY MR. TOTINO:

Q. Exhibit 2, Mr. Snyder, is the notice of motion for class certification filed by plaintiffs in this case. It looks like it was filed on July 8, 2014, which is after your report, because your report is signed July 1st, 2014; correct?

A. Yes.

Q. So have you ever seen this notice of motion for class certification before?

A. I don't think it was sent to me. It may have been, but it was extraneous at this point.

Q. Okay. So let's take a look at page 1 of the notice of motion for class certification. There's the class definition that plaintiffs seek to certify set forth there. There's two, an (a) and a (b). Let's first take a look at (a). I'll read it for the record and you can read along for yourself:

"All California residents who, at any time from March 1st, 2011, through and

including July 17, 2012, used a cellular telephone with a California area code while located in California to call a toll-free number operated by defendant and whose calls were routed to any of defendant's English-speaking call centers and were recorded by defendant without notice."

Do you see that?

A. Yes.

Q. Okay. And that's defined in here as the "cellular class."

Based upon what you just told me of what you would do to ascertain the class, could you figure out who the members of that class are based upon the checking of whether a cellular telephone number was used and who the subscriber was?

A. I think I could describe it this way: I would be confident in saying that you could identify individuals associated with a telephone number that may be a member of that class. Of course, I don't know all of the details and subsets or, you know, I'm not an expert in that.

But given a phone number, I'm confident that you could identify an individual that may be included in this class.

associated with the person who is the subscriber or the user of the phone potentially; right?

A. Yes.

Q. But you can't figure out whether they actually live in California or not based on that; right?

A. Unless it was possible -- so again, the information service companies have lots of data.

Q. Uh-huh.

A. I don't doubt that you can go through multiple layers of filtering out the data obtained, just as you have laid out with these nine criteria, and say, okay, first, well, they have a California address, then take that address and see if you can cross-correlate it with other information to see if -- maybe tax records, is that their primary residence or not.

So I think there's methods to do that. Again, not being a lawyer and not knowing what residence means, but I do believe that there's -- these companies are in the business of basically doing this type of investigative work and forensic work.

Q. You've never done that before personally; right?

A. I've never personally filtered this data, no.

Q. You have never tried to determine the residency of someone, personally; right?

A. No.

Q. And it may very well be that someone has a billing address in California but actually has a residency in Nevada because they don't want to pay income tax or something; right?

A. Yeah, that's possible.

Q. Then -- so let me ask you this:

Can you determine whether a person is a California resident based solely on his or her cellular telephone number?

A. It's not that absolute. You may or may not be able to tell.

Q. Okay. Then another factor in here that we went through was they made the call while located in California. Do you see that, in this part (a)?

A. Yes.

Q. Okay. So we have to figure out to ascertain the class whether they made the call while located in California. Can you determine that solely based on his or her cellular telephone number?

A. Most likely, yes.

Q. How would you go about doing that?

A. Depending on the carriers that were serving

the numbers. Let's take an example of an individual number of one carrier, let's say AT&T Mobility; they maintain call detail records for several years for a variety of reasons.

Those call detail records will show and demonstrate that a call was actually made to one of these toll-free numbers at a given time and the cell site the call was made from, from a cellular phone and the switching system where the call originated.

So you could determine the geographic area of those two systems to determine whether they were in the boundaries of California.

Q. You can get the data from the cellular telephone company?

A. That's correct.

Q. Have you ever done that?

A. Yes.

Q. When?

A. Oh, there's been several cases I've been involved with where we were doing location-based information. I've done a few cases based on location-based services where it's important to determine the geography of the switching system or the cell sites.

I was with a couple of start-up companies that -- whose expertise was in obtaining location data from the carriers and actually accessing this data in real time as opposed to the data that's stored in the call detail records.

So it's there, and I've been involved with obtaining that data.

Q. Have you ever obtained it after the fact, not in real time?

A. Yes, not by asking for it, but I have looked at call detail records that were provided that had those identifiers included in the record, that had like a switching ID or some acronym for a cell site ID that actually clearly identified the cell the call was either terminated in or originated from.

Q. What company was that or what cell phone company was that?

A. I'm trying to remember. I don't know off the top of my head. I know that they all actually had the data, but I don't remember in which case we were provided those records, whether -- I'm thinking possibly T-Mobile but I'm not sure.

Q. Okay. And how many times have you seen those records with the location data?

A. Oh, many times.

that definition there is a factor, it says "were recorded by defendant." Do you see that?
A. Yes.
Q. Can you determine whether a person's call was recorded by a defendant based solely on his or her cellular telephone number?
A. No.
Q. And then the next one says "without notice." Do you see that?
A. Yes.
Q. Okay. I presume that's notice that calls may be recorded, because that's what we are here about today.
Can you determine whether or not a person was provided with notice that calls may be recorded based solely on his or her cellular telephone number?
A. No.
Q. Now, let's take a look at subclass (b) there. Do you see that in front of you --
A. Yes.
Q. -- on this Exhibit 2? I'll read it for the record. It says:
"All California residents who, at any
time from March 1st, 2011, through and
including July 17, 2012, used a cordless

THE WITNESS: It appears that each paragraph is a copy of the other except for a couple of terms.

BY MR. TOTINO:

Q. Are the couple of terms "used a cordless telephone"?

A. It appears that way at just a casual glance right now.

Q. Let me ask you this: Can you determine whether a person used a cordless telephone based solely on his or her cellular telephone number?

MR. GROVER: Objection. Vague and ambiguous.

THE WITNESS: That doesn't make sense to me.

BY MR. TOTINO:

Q. Because if you are using a cellular telephone, you are not using a cordless telephone --

A. Yes, cordless technology is quite different from cellular technology.

Q. Can you tell whether a person used a cordless telephone based on the telephone number at all?

A. I don't know. I was asked to opine on landline versus cellular issues. I don't know if there is a mechanism to determine if you can tell what kind of handset was used on a landline phone.

Q. Have you ever heard of anything like that?

A. No.

Q. And you are not an expert in that area; right? Determining whether someone used a cordless telephone or not?
A. That's correct.
Q. Who drafted this declaration that you signed?
A. I did.
Q. Did you have any assistance?
A. No.
Q. If we go back to page 13 of Exhibit 1, paragraph 26, again it says:
"Based on my education, knowledge, experience, expertise and training, it is my expert opinion that the proposed members of the class in this case can be definitively and clearly ascertained based solely on their cellular telephone numbers."
Do you see that?
A. Yes.
Q. Now that you have seen the class definitions in Exhibit 2, the cellular class and the cordless class, do you believe that's a true statement still?
A. Well, that's out of context. Paragraph 26 is certainly based on a summary of everything illuminated and described in previous pages.
I never made a statement that every single

class that might be or every category of class that might be included is the basis for this paper.

I was simply asked to opine on mostly the cellular telephone numbers and the ability to identify individuals associated with a cellular telephone number.

In that instance, I would still stick by 26. If I was told ahead of time that there were all these subsets and classes, I would say, well, proposed members of the cellular class.

Q. Okay.

A. So given a chance to supplement this, I would probably use the word "cellular class" in there.

Q. But can you -- based on what we have gone through, if you look at the definition of cellular class in Exhibit 2, page 1, section 2(a), I think you've testified you can determine whether someone was using a cellular telephone or not at the time of a call based on the cellular telephone number and potentially where they are located -- excuse me -- who they are and potentially where they are located, but you can't determine the other factors here, which is whether they were recorded by defendant, whether they received notice, whether they are a California resident; is that right?

legislation relevant to this case?
A. No.
Q. Have you testified before any legislative body that has considered legislation or regulations relevant to this case?
A. No.
Q. What areas do you consider yourself an expert in?
A. It's hard to say. Generally I would say I'm an expert in all areas of signaling networking in the core network used for cellular technology.
An area where I'm not an expert in is the radio interface. That's the radio technology, essentially, between a handset and the antenna at the base station. So I never was involved in RF engineering or any of that stuff.
But anything from the antenna back to services, features, standards, protocols, and individual network elements, the switching systems, ancillary elements, and basically how the overall system works down to a pretty fair level of detail, I would say I'm an expert in.
Q. And all of it is cellular networks?
A. Some with landline. Landline's actually much simpler than cellular. So yes, they use some of the

for a TCPA case to go to trial, I think, so...
Q. How long have you been serving as an expert witness?
A. Since about the beginning of 2007.
Q. 2007, you said?
A. Yes. About seven, seven and a half years.
Q. And how many cases have you been retained in, ballpark?
A. Eighty.
Q. And you have testified as to one case, you mentioned, the intellectual property case?
A. Yes.
Q. How many intellectual property cases have you worked on, ballpark?
A. Ten or twelve.
Q. And what about the remaining 70 to 68 cases?
A. There's about 50 TCPA cases, and the rest are, you know, under Unfair Business Practices or FDCPA or, like this case, this is the first case that's a Penal Code case, I guess.
So there's been about 20, I guess, that are...
Q. So this is the first telephone recording case you've worked on?
A. Yes, yes.

Q. And can you tell me the percentage of cases that you have worked on for the plaintiffs as opposed to the defendant side? Do you know? And a ballpark is okay.

A. I probably worked on 10 to 15 defense cases. Mostly plaintiffs.

Q. And have you ever worked on the defense cases -- defense side on a TCPA case, or no?

A. Yes.

Q. Which case was that?

A. I have been retained on three cases on the defense side. Two I was a consulting expert. The first one I was a consulting expert. I basically told them I couldn't -- we --

MR. GROVER: He asked for the names of the cases.

THE WITNESS: Oh, one was Kramer versus Autobytel. It's in my case list. I was a consulting defendant.

Thank you.

The other was -- it was against, I forget the plaintiff's name -- Hilton Grand Vacations. I was on the defense side.

And I've been retained on the defense side now on a case against Monitronics, which is the --

MR. GROVER: Just to clarify, I'm not involved in the case but my firm is.
MR. TOTINO: Okay.
MR. GROVER: But it's not the same thing that I'm involved in.
BY MR. TOTINO:
Q. And that's a TCPA case?
A. Yes.
MR. BERNSTEIN: For clarity, in case it's not already clear, I'm not involved in that one either.
BY MR. TOTINO:
Q. So the law firm Kelly Grover is involved in Nunez vs. Twitter?
A. Yeah, and I just found that out last night.
Q. They were the ones who retained you, or some one else?
A. No, I was retained by a law firm out of Chicago.
Q. Is it fair to say that most of your opinions are in TCPA cases?
A. Yes.
Q. And I think you mentioned already this is the only telephone recording case you are involved in; right?
A. Yes.

Q. So you haven't been involved in any other California Privacy Act cases except the Penal Code section you mentioned, Section 632 or 632.7?
A. That's correct.
Q. In any of the previous cases you are involved in other than the criminal ones that you were asked about, those two, did you ever have to determine caller location?
A. I don't think so.
Q. When were you first contacted on this case?
A. Earlier this year. I don't know the exact month.
Q. And who contacted you?
A. I think Eric Grover did.
Q. Mr. Grover, who is sitting next to you right now?
A. Yes.
Q. And what did he tell you about the case?
A. He described it to me a little. I said I'm not really familiar with the law, California state law, of course. And he basically asked me if I knew about telephone numbering, and we discussed basically the issues that he wanted me to potentially opine about. And I said, yeah, sure, I have lots of testimony in that area in other cases.

I -- well, not just out on my own, but that I concentrated more on expert litigation.

I probably made, in 2012, $225,000 maybe.

Q. Okay. And what about 2013, last year?

A. I think I made about the same, maybe a little more, 240 or 250.

Q. And what about so far this year in 2014?

A. In 2014 I will surpass 2013, certainly, but not by a large amount at this rate.

Q. And is your work -- as a litigation expert witness consultant, what percentage of your work is that?

A. It's declined. So I am still -- I have a contract, and I do some engineering work for a company in Florida that's designing products for the LTE networks; so I know quite a bit about that.

But I think in 2012 I had a full-time contract for the first six months of the year while I was doing this type of litigation work.

And then from July 1st on, the second half of the year, I only spent about a month doing work other than litigation.

And then in 2013 it was probably about 11 months out of 12 was mostly litigation.

Q. So far in 2014 --

I know that call detail records have been subpoenaed on many occasions without the -- without the authorization of the identity of one of the other parties in the call or both of them.

Q. But you say it may be different if you ask for subscriber information?

A. Yes. I've been on a couple of cases where we received subscriber data, and again I'm not sure the legalities of that. We did receive it and I've seen those records that had the name, address, you know, and some redacted information about the subscriber, but I don't recall if there had to be any authorization to obtain that.

Q. Do you consider yourself an expert in subpoenaing records from cell phone companies?

A. No.

Q. Do you know whether -- we have two plaintiffs in this case, one is Laura McCabe. Do you know whether her records were subpoenaed from a cell phone company in connection with this case?

A. No.

Q. Any other -- Latroya Simpson, do you know whether her records were subpoenaed in connection with this case?

A. No.

available, the switching records won't be there either?

A. Generally, no.

Q. Now, let's look at paragraph 20 of your declaration, Exhibit 1 again. You discuss exhibit B to your declaration; right?

A. Yes.

Q. What is exhibit B?

A. This was actually a leaked document. There is a more updated one I think I found from 2012. After I did this report I was searching around the last few weeks.

This is not supposed to be a public document, but it was leaked by one of the wireless news services. And when I found this about two years ago, this was a big revelation to a lot of people. Everybody knew that these records were saved.

And these are general numbers for the carriers, but there was no standard. But somebody leaked this from the department of justice and it became a public document and it was all over the wires.

So I pulled this out and I've used it. I think this is generally accurate and especially for the time frame. I -- and like I said in my report,

I've no reason to believe why this is still not accurate today even though this is a three-year-old document.
Q. You said you found a more recent one, though?
A. I think I saw one that said 2012, and I'm not sure. And the way I did that was I basically took this title "Retention Periods of Major Cellular Service Providers" and just plugged that into Google with quotes around it.
Q. You did not bring it with you, though?
A. I did not.
Q. You said this was leaked by the federal government somehow?
A. Somehow it was leaked. And I subscribe to a whole bunch of wireless news services that I read every day to keep up with things. And there was one day a couple of years ago where this -- it says -- oh, "cellular service provider retention periods" and you click on it and it was an article, and they would say, well, this was leaked out onto the Web and they have this as a downloadable PDF.
Q. Okay.
A. So I don't think this was originally intended for public dissemination but it was disseminated publicly.

Q. Okay. And you think it's reliable?
A. I do.
Q. But you haven't tested it; right?
A. I haven't actually tested each one of these for each of these carriers, but I've heard nothing to the contrary from information I've gotten back on TCPA cases about notification and things like that.
Q. Okay. So taking a look at exhibit B to your declaration, so let's look first for Verizon. It's the first column. First of all, is Verizon the largest carrier in the U.S.?
A. It depends what you mean by "largest." Most subscribers?
Q. Yes.
A. They're usually battling back and forth between AT&T Mobility. I think Verizon might have 1 million or 2 million more right now, but they are well over 100 million each.
Q. And what percentage of the market is that; do you know?
A. It's probably about 30 percent.
Q. So AT&T would have 30 percent or so and Verizon would have 30 percent or so and the other 40 percent is split up among the other companies?
A. Yeah, I think there's something like 330

Q. And the same thing with the call detail records, you don't really know how far they go back or --
A. That's right. You know, I look at this as a general indication.
Q. Okay. You are not an expert on this retention period of cell phone carriers; right?
A. No, I'm not.
Q. So if we took exhibit B as accurate, the only company that would have call detail records that are more than two years old would be AT&T and T-Mobile for the prepaid, right, or postpaid?
A. That may be.
Q. Okay. So those are the only ones that would have records relevant to the class period, right, because the class period is more than two years old at this point?
A. That may be true.
Q. And with respect to the cell towers used by the phones for calls, looks like only AT&T -- if this exhibit B is accurate, only AT&T would have records relevant to the class period; right?
A. That may be true as well. But, of course, I do think you have to request it to know for sure.
Q. Do you know whether this information was ever

information is available as you say here; right?
A. No. I'm just saying the information exists. You know, if you ask me, say, 20 years from now, I could easily say, well, I don't know; it might not. I just don't know.
Q. I think what you are saying is the information existed at one point; you just don't know whether it is still there or not?
A. You are exactly right.
Q. And you haven't gone to each carrier and checked?
A. That's correct.
Q. Okay. Were you asked to do that?
A. No.
Q. And if exhibit B to your declaration is to be believed, a lot of the information may very well not be there; right?
A. If -- if that exhibit, which I received, obviously, from a third party, that was made publicly available, is truly 100 percent accurate in every way, yes, I would say that a lot of that information would not be available, but I don't know that hypothetical for sure.
Q. Now, I think I asked you a question about cordless telephones before. You are not aware of any

way to determine whether someone was using a cordless telephone to make a call; right?
A. That's correct. I wasn't asked to provide an opinion on that.
Q. Okay. I think you mentioned you don't have much experience with voice-over-Internet protocol?
A. That's correct.
Q. So you don't know anything about Magic Jack or Skype?
A. No, I generally understand how they work and how Vonage works, but I wouldn't say I have a depth of technology expertise as I do on traditional cellular and landline networks.
Q. Okay. Do you know, with the voice-over-Internet protocol technology someone could be located, for instance, in New York and have a California area code? Is that right?
A. Yes, but there are certainly issues with IP addresses that, depending on how the operators use them and how the calls are routed through the network, they may not be truly representative of location. Generally IP addresses are geolocation-based.
Q. Okay. But do you know if the carriers keep the IP addresses when a person makes a call or not?
A. For voice-over-IP, I don't know that. The IP

A. Yes.
Q. And this is all about the person who owns the telephone number, is that right, or pays the bill?
A. The registered user, typically the one that has the account and pays the bill.
Q. So if I have an account in my name but I get an extra phone to give to my wife, it may not have her information on it; right?
A. It may or may not. I have seen lots of billing records in a lot of the cases where even though there is a single payor and address, there's actually a name associated with every number, and some of the carriers actually require that now, so even on a family plan you have to list the name.
But again, if those phone numbers were used for any other public documentation, that might be cross-referenced in a database.
Q. In a database, you mentioned, yeah.
But as far as the carriers' subscriber information, they don't all require you to have your family members listed out; right?
A. I don't know that for sure for each carrier. I think AT&T Mobility did when I put my son on my wife's plan.
Q. Have you done any analyses or studies on the

variance between the account holders and the phone users?

A. No.

Q. Do you know what percentage of phone users are not account holders?

A. Could you clarify the question, please?

Q. Yeah. I mean, there is a person listed with the carrier as the account holder who pays the bills and it's their address. Do you know what percentage of people who actually use the phones are not those people that are listed with the carrier?

A. What, you mean like if I lend my friend the phone to make a call because his is out of battery power or something?

Q. No. If you have a family plan, for instance, you give a phone to your kid but you don't put their name on the account; do you know what percentage that is?

A. I don't know offhand. You might be able to research it.

Q. But you have never done that; right?

A. I haven't done that.

Q. And it's not just family members. Some people, if they have friends, will let friends have accounts on their family plan; right?

I, the undersigned, an RPR, CRR, and Certified Shorthand Reporter of the States of Nevada and California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that before completion of the proceedings, review of the transcript was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 0[illegible]2014

RealLegal Notary for E-Transcript

JANET C. TRIMMER
CCR No. 864