NANCY L. STAGG, CA Bar No. 157034
  nstagg@foley.com
**FOLEY & LARDNER LLP**
3579 VALLEY CENTRE DRIVE, SUITE 300
SAN DIEGO, CA 92130
TELEPHONE: 858.847.6700
FACSIMILE:  858.792.6773

Attorneys for Defendant
WYNDHAM HOTELS AND RESORTS, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOYCE ROBERTS,  individually and on behalf of classes of similarly situated individuals,<br><br>                                    Plaintiff,<br><br>            vs.<br><br>WYNDHAM INTERNATIONAL, INC.; WYNDHAM WORLDWIDE OPERATIONS, INC.; WYNDHAM HOTELS AND RESORTS, LLC; and DOES 1 through 10, inclusive,<br><br>                                    Defendants. | Case No. 12-CV-05083-PSG<br><br>**DECLARATION OF NANCY L. STAGG IN SUPPORT OF WYNDHAM HOTELS AND RESORTS, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>CLASS ACTION<br><br>Date:          September 1, 2015<br>Time:         10:00 a.m.<br>Courtroom:   5<br>Judge:        Hon. Paul S. Grewal<br><br>Complaint Filed:      July 17, 2012<br>FAC Filed:            February 2, 2015 |

I, NANCY L. STAGG, declare:

1.      I am an attorney duly licensed to practice law before the courts of the State of California and admitted to practice in this District.  I am a partner of the law firm of Foley & Lardner LLP, attorneys of record for Defendant Wyndham Hotels and Resorts, LLC ("Defendant" or "WHR") in this action.  I am the attorney principally responsible for the representation of Defendant.  As a result, I have personal knowledge of the facts set forth in this Declaration.  If called to testify to the truth of matters asserted herein, I could do so truthfully, competently, and of my own personal knowledge.

2.      I submit this declaration in support of Defendant's Opposition to Plaintiff's Motion for Class Certification ("Opposition").

3.      Attached hereto as **Exhibit A** are true and correct excerpts from the deposition of Plaintiff Joyce Roberts, which occurred on May 17, 2013, with relevant portions highlighted for the Court's convenience.

4.      Attached hereto as **Exhibit B** are true and correct excerpts from the deposition of Plaintiff's expert Anya Verkhovskaya, which occurred on June 2, 2015, with relevant portions highlighted for the Court's convenience.  Pursuant to the Parties' stipulation regarding this deposition, Verkohvskaya has 30 days to review and sign the deposition transcript, which has not passed as of the filing of this Opposition, but which will occur before the hearing on Plaintiff's Motion for Class Certification.  I will file a Supplemental Declaration after the 30 days has elapsed if Verkhovskaya makes any substantive changes to her deposition testimony that affect the attached excerpts.

5.      Attached hereto as **Exhibit C** are true and correct excerpts from the deposition of Plaintiff's expert Randall Snyder, which occurred on May 29, 2015, with relevant portions highlighted for the Court's convenience.  Pursuant to the Parties' stipulation regarding this deposition, Snyder has 30 days to review and sign the deposition transcript, which has not passed as of the filing of this Opposition, but which will occur before the hearing on Plaintiff's Motion for Class Certification.  I will file a Supplemental Declaration after the 30 days has elapsed if Snyder makes any substantive changes to his deposition testimony that affect the attached excerpts.

6.      Attached hereto as **Exhibit D** is a true and correct copy of the Initial Report and Declaration of WHR's Expert Witness David M. Stein, dated April 27, 2015, including his C.V. as

Exhibit A to his Initial Report. This Initial Report, plus the Rebuttal Report below at Exhibit E are submitted as Stein's Declarations in Support of WHR's Opposition to Plaintiff's Motion for Class Certification.

7.    Attached hereto as **Exhibit E** is a true and correct copy of the Rebuttal Report and Declaration of WHR's Expert Witness David M. Stein, dated May 28, 2015.

8.    Attached hereto as **Exhibit F** is a true and correct copy of a document produced by Plaintiff on July 15, 2013, in discovery in this case, Bates stamped ROBERTS-WYNDHAM-0027.

9.    Attached hereto as **Exhibit G** is a true and correct copy of Defendant's Written Responses To Plaintiff's Second Notice of Deposition of Person Most Knowledgeable dated April 1, 2015.

10.    Attached hereto as **Exhibit H** is a true and correct copy of the Declaration of Alan Vasquez, Settlement Claims Administrator, filed in *Stone v. Howard Johnson International, Inc.*, Case No. 12-cv-1684-PSG (C.D. Cal.).

11.    Attached hereto as **Exhibit I** is a true and correct copy of the Superior Court's Order Denying Class Certification in *Coleman v. First American Home Buyers Protection Corporation*, Case No. BC420436, Los Angeles Superior Court (Order dated Aug. 27, 2012).

12.    Attached hereto as **Exhibit J** is a true and correct copy of Exhibit 4 to the Deposition of Randall Snyder in this case, taken on May 29, 2015, without exhibits, which is the Declaration of Randall Snyder in *McCabe v. Intercontinental Hotels Group Resources, Inc., et al.*, Case No. 3:12-cv-04818-NC (N.D. Cal.), Dkt. No. 80-8.

13.    Attached hereto as **Exhibit K** is a true and correct copy of excerpts from the Court's docket in *Shamblin v. Obama For America*, Case No. 13-cv-02428-VMC (M.D. Fla.), showing denial of class certification.

14.    Attached hereto as **Exhibit L** is a true and correct copy of the District Court's Order Granting Motion for Judgment on the Pleadings in *Young v. Hilton Worldwide Inc.*, Case No. 12-cv-01788-R-(PJWx) (C.D. Cal. July 14, 2014), Dkt. No. 62.

///

///

1      I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct.

3      Executed on June 19, 2015, at San Diego, California.

4                                          /s/ Nancy L. Stagg
                                          NANCY L. STAGG

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2

The undersigned hereby certifies that a true and correct copy of the above and foregoing

3

document has been served on June 19, 2015 to all counsel of record who are deemed to have consented

4

to electronic service via the Court's CM/ECF system per Civil Local Rule 5.1.

5

6
/s/ *Nancy L. Stagg*
Nancy L. Stagg

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4820-0220-6756.2

**EXHIBIT B**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3    JOYCE ROBERTS, individually

 4    and on behalf of a class of

 5    similarly situated individuals,

 6                      Plaintiff,

 7       vs.                          Case No.

 8    WYNDHAM HOTELS AND RESORTS,     5:12-cv-05083-PSG

 9    LLC, and DOES 1 through 10,

10    inclusive,

11                      Defendants.

12    _____/

13

14

15       VIDEOTAPED DEPOSITION OF ANYA VERKHOVSKAYA

16                   Milwaukee, Wisconsin

17                  Tuesday, June 2, 2015

18

19

20

21

22    Reported By:

23    Deborah Habian

24    RMR, CRR, CLR, CSR. No. 084-02432

25    JOB NO. 10016952
```

```
 1           IN THE UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3    JOYCE ROBERTS, individually

 4    and on behalf of a class of

 5    similarly situated individuals,

 6                    Plaintiff,

 7      vs.                            Case No.

 8    WYNDHAM HOTELS AND RESORTS,      5:12-cv-05083-PSG

 9    LLC, and DOES 1 through 10,

10    inclusive,

11                    Defendants.

12    _____/

13

14

15

16

17           The videotaped deposition of

18    ANYA VERKHOVSKAYA, called by the Plaintiff,

19    taken at the offices of Foley & Lardner, LLP,

20    777 East Wisconsin Avenue, Milwaukee, Wisconsin,

21    beginning at 9:50 a.m. and ending at 11:33 a.m.

22    CST on Tuesday, June 2, 2015, before Deborah Habian,

23    RMR, CRR, CLR, CSR. No. 084-02432.

24

25
```

```
 1   APPEARANCES:

 2   For Plaintiff

 3            KELLER GROVER, LLP
              BY:  ERIC A. GROVER
 4                (via teleconference)
              1965 Market Street
 5            San Francisco, California 94103
              415.543.1305
 6            415.543.7861 Fax
              eagrover@kellergrover.com

 7

 8               and

 9            LAW OFFICES OF SCOT D. BERNSTEIN, APC
              BY:  SCOT BERNSTEIN, ESQ.
10            101 Parkshore Drive
              Suite 100
11            Folsom, California 95630
              916.447.0100
12            916.933.5533
              swampadero@sbernsteinlaw.com

13

14   For the Defendant Wyndham Hotels and Resorts, LLC

15            FOLEY & LARDNER, LLP
              BY:  NANCY L. STAGG, ESQ.
16                (via teleconference)
              3579 Valley Centre Drive
17            Suite 300
              San Diego, California 92130-3302
18            858.847.6700
              858.792.6773 Fax
19            nstagg@foley.com

20               and

21            FOLEY & LARDNER, LLP
              BY:  AARON R. WEGRZYN, ESQ.
22            777 East Wisconsin Avenue
              Milwaukee, Wisconsin 53202-5306
23            414.319.7028
              414.297.4900 Fax
24            awegrzyn@foley.com

25   ALSO PRESENT: Marvin Oltman, videographer
```

```
 1                    I N D E X
 2   WITNESS                            EXAMINATION
 3     ANYA VERKHOVSKAYA
 4                    BY MS. STAGG              6
 5
 6
 7                    EXHIBITS
 8   Defendants'                              PAGE
 9   Exhibit 1     Declaration of Anya          9
10                 Verkhovskaya of A.B. Data,
11                 Ltd. in Support of Plaintiff's
12                 Motion for Class Certification
13
14   Exhibit 2     Defendant Wyndham Hotels and  53
15                 Resorts, LLC's Notice of
16                 Taking Videotaped Deposition
17                 of Anya Verkhovskaya of A.B.
18                 Data, Ltd. and Request for
19                 Production of Documents
20
21   Exhibit 3     Documents produced by         53
22                 Defendants stated in
23                 Anya Verkhovskaya of
24                 A.B. Data, Ltd.'s
25                 Declaration
```

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

1          THE VIDEOGRAPHER:  The time on the record is

2   9:50 a.m.  Today's date is June 2nd, 2015.  My name is

3   Marvin Oltman of Aptus Court Reporting.  The court

4   reporter today is Donna [sic] Habian, also from Aptus

5   Court Reporting, located at 600 West Broadway,

6   Suite 300, in San Diego, California, 92011.

7          This begins the video recorded deposition of

8   Anya Verhos --

9          THE WITNESS:  Kaya.

10         THE VIDEOGRAPHER:  -- Verkhoskaya -- thank

11  you -- testifying in the matter of Joyce Roberts vs.

12  Wyndham International, Incorporated, et al. pending in

13  the U- -- United States District Court for the Northern

14  District of California, the case number is 12-cv-05083,

15  taken at Foley & Lardner, LLP at 777 East Wash- --

16  excuse me -- East Wisconsin Avenue in Milwaukee,

17  Wisconsin.

18         Will counsel please identify themselves and

19  state the parties who they represent.

20         MR. BERNSTEIN:  Scot Bernstein for the

21  plaintiff.

22         MR. WEGRZYN:  Aaron --

23         MR. GROVER:  Eric Grover, plaintiff.

24         MS. STAGG:  Nancy Stagg of Foley & Lardner on

25  behalf of the defendant Wyndham Hotel and Resorts, LLC.

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

```
1              MR. WEGRZYN:  Aaron Wegrzyn present in
2       Milwaukee on behalf of Wyndham as well.
3              THE VIDEOGRAPHER:  Will the court reporter
4       please swear in the witness and then we may proceed.
5              THE REPORTER:  Raise your right hand.
6                    (Oath administered.)
7              THE WITNESS:  I do.
8              THE REPORTER:  Thank you.
9
10                  ANYA VERKHOSKAYA,
11       called as a witness herein by Defendant, having been
12       first duly sworn, was examined and testified as follows:
13                      EXAMINATION
14       BY MS. STAGG:
15          Q.   Good morning, Ms. Verkhoskaya.  I'm Nancy
16       Stagg.  I represent the defendants in this case -- or
17       the defendant in this case, Wyndham Hotel and Resort.
18       Thank you for putting up with our technological issues
19       this morning and I hope to be brief.
20          A.   Okay.
21          Q.   First of all, did I say your name correctly?
22       Because I know I hate when people mispronounce my
23       name.
24          A.   Yes, you did.  Thank you.
25          Q.   Could you tell me what your educational
```

```
 1    background is?

 2         A.    I have Bachelor's of Science.

 3         Q.    And when did you get a Bachelor of Science?

 4         A.    In '93.

 5         Q.    And from what school or university?

 6         A.    Molloy College.

 7         Q.    Can you spell that?

 8         A.    M-O-L-L-O-Y.

 9         Q.    And where is that school located?

10         A.    On Long Island, New York.

11         Q.    And what was your Bachelor of Science in?

12    What was your area of concentration?

13         A.    Nursing.

14         Q.    Since you received that Bachelor of Science

15    in 1993, have you had any additional education --

16    formal education?

17         A.    No.

18         Q.    Thank you.

19               Do you hold any licenses such as a licensed

20    private investigator?

21         A.    No.

22         Q.    You understand that you have been put forth

23    as an expert witness in this case?

24         A.    That's correct.

25         Q.    And I understand that you are the -- if I
```

```
 1   understand correctly, the president -- I'm sorry --
 2   partner and chief operating officer in A.B. Data,
 3   Limited; is that correct?
 4       A.   It is A.B. Data's Class Action
 5   Administration Company.
 6       Q.   Thank you.  Have you ever previously been
 7   designated as an expert witness on the topic of
 8   ascertainability of class members prior to class
 9   certification?
10       A.   Yes.
11       Q.   When was that?
12       A.   In the past four years, there were
13   approximately twelve instances.
14       Q.   Okay.  And can you -- in those twelve
15   instances, have the case issues been involving call
16   recording class actions?
17       A.   No.
18       Q.   Can you tell me in those twelve instances
19   that you recall where you've been retained as an
20   expert witness on ascertainability of class prior to
21   class certification, have those all -- cases all been
22   on the same subjected subject matter?
23       A.   No.
24       Q.   Can you tell me what the subjects of those
25   classes were?  In other words, were they TCPA cases,
```

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

1              Actually, on pages 5 and 6 of my declaration

2      there is a list of cases already identified as such.

3          Q.   Okay.  All right, so all of those cases that

4      are identified in paragraph 12 of your declaration are

5      cases in which you've provided ex- -- an expert

6      report.  We'll talk about whether or not you actually

7      testified as an expert witness, but in those cases you

8      were asked to give opinions on the ascertainability of

9      the class pre-certification?

10         A.   Correct.

11         Q.   Okay.  Now, in any of those cases identified

12     in paragraph 12 of your declaration, was your expert

13     opinion challenged by the opposing party, if you know?

14         A.   Yes.

15         Q.   In which cases?

16         A.   (Reviewing document.)

17              In Shamblin vs. Obama For America, I believe

18     also in Krakauer vs. DISH, and there could be some

19     others that I can't recall right knew.

20         Q.   All right.  And do you know whether or not

21     your testimony was admitted or stricken in -- in the

22     Shamblin vs. Obama case or the Krakauer vs. DISH case

23     that you identified?

24         A.   My testimony was admitted in the Shamblin

25     vs. Obama For America.  In Krakauer, I believe the

**Page 10**

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

1   decision was not yet made.  And as far as I know, my

2   testimony was never stricken in any of those cases.

3        Q.   All right.  Did any of those cases result in

4   class certification, if you know?  And let me --

5   actually, let me be clearer.

6            In -- in all of the cases identified in

7   paragraph 12 of your declaration, do you know whether

8   or not classes were ultimately certified?

9        A.   In Benzion vs. Vivint, the class was

10   certified.  (Reviewing document.)

11           That's as -- that's all the information that

12   I have at this time.

13        Q.   Thank you.

14           Would you say that your primary -- well, let

15   me strike that.

16           Would you say that the primary work that

17   A.B. Data Class Action Administration does is

18   providing class administrative services after class

19   certification?

20        A.   Could you please clarify what you mean by

21   "primary"?

22        Q.   Sure.  Would you say that more than 50% of

23   A.B. Data's Class Action Administration, more than 50

24   percent of its work is providing class administration

25   after a certification?

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

1      A.    Correct.

2      Q.    Okay.  Would you say that's more than

3   75 percent of its work?

4      A.    I have not performed such an analysis.  I

5   would feel comfortable to say it's more than 50, but

6   I'm not sure whether it's more than 75 percent.

7      Q.    Okay.  And in the cases in which you're

8   providing class administration services, would you

9   agree that the primary purpose -- well, actually,

10   that's not a good question.

11            I would say part of the process of the post

12   certification class administration is giving notice to

13   the identified class members, correct?

14      A.    A part of the process is identifying class

15   members and then providing notice to them.

16      Q.    Okay.  Let me ask it this way.  In the cases

17   that you have worked on in class administration post

18   certification, how much of that experience let's say

19   in the last three years has involved actually trying

20   to identify who was in the class as opposed to giving

21   notice to identified class members?

22      A.    I have not performed this type of analysis.

23      Q.    You haven't made an evaluation as to how

24   much work you have done at A.B. Data class

25   administration and actually trying to identify a class

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

1    list and we don't need to identify any of class

2    members.   In FLSA and other labor and employment

3    cases, we always receive a list and we never need to

4    identify class members.

5              I can't really answer your question without

6    knowing which segment of class action administration

7    you're referring to.

8         Q.   Well, in this case, obviously it involves

9    issues relating to identifying callers in call

10   recording cases and you -- you have not done that

11   previously, have you, where you had to identify who a

12   caller is from phone records pre -- in other words, in

13   this case, you're giving an opinion that class members

14   in the proposed classes could be identified and

15   ascertained for purposes of class certification

16   through the methodology that you describe in your

17   declaration, correct?

18        A.   Correct.

19        Q.   Okay.  And -- but you have not performed

20   that previously, correct?

21        A.   Incorrect.

22        Q.   Okay.  When have you done that?

23        A.   We have performed this type of methodology

24   described in the declaration on 50 different cases,

25   approximately, in the past few years.

**Page 14**

1      Q.    Okay.  Do you understand that in this case,

2    there is no settlement and you are being proposed

3    to -- you're being proposed as an expert to support a

4    program for ascertaining who is actually in the class?

5      A.    I do.

6      Q.    Okay.  And so in this case, is the

7    methodology that you're proposing for identifying

8    class members designed to achieve something more than

9    a 75 percent rate of identification?

10     A.    Correct.

11     Q.    The -- okay.

12     A.    The question -- the question I was answering

13    before was not on ascertainability.  It was on notice.

14     Q.    Sure.  Okay.  So in the cases in which

15    you're providing notice and not trying to ascertain

16    the class, your standard is to design a program to

17    reach 75 percent of the identified class?

18     A.    Incorrect.

19     Q.    Okay.  Tell me what's wrong with that.

20     A.    We design a program to reach at least

21    75 percent to a hundred percent.

22     Q.    Okay.  And how do you -- how do you measure

23    whether or not you've reached that percentage, 75 or

24    greater, in those cases?

25     A.    There are complex methodologies that have

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

```
 1   been approved by the Court on measuring media reach

 2   and frequency, plus direct notice reach and frequency,

 3   plus social media and other types of notices involved

 4   and cumulating it with complex formula that we usually

 5   spell out to the -- for the Courts.

 6        Q.   All right.  Now, in these cases, though,

 7   you're saying that the industry average is about a 10

 8   to 12 percent claims response rate, correct?

 9        A.   Correct.

10        Q.   Okay.  So how is it that you are measuring

11   the 75 percent or greater metric that you just

12   testified to?  In other, words, if the claims rate is

13   10 to 12 percent in most cases and the goal is to

14   achieve notice to 75 percent or more of the class,

15   what -- what metric of measuring to determine that

16   you've achieved that level of notice.  How -- in other

17   words, how are you assessing the success of meeting

18   that 75 percent or greater notice?

19        A.   If we have a list of a hundred people and we

20   mail a hundred notices and none of them return as

21   undeliverable, a hundred people and hundred percent of

22   our class list have been notified.  Only 10 percent of

23   them decide to file a claim, we receive 10 claims.

24        Q.   So that involves mail notice, correct?

25        A.   As I stated earlier, it is a formula that
```

 1   involves media, mailed notice, social media and other

 2   methods of notice.

 3        **Q.   What are you -- are you relying on in making**

 4   **your assessment that at least 75 percent or more of**

 5   **the class have been notified through the use of social**

 6   **media, for example?  You know, I am just trying to**

 7   **understand how you are measuring that apart from mail**

 8   **notice.**

 9        A.   Sure.

10        MR. GROVER:  Objection, vague and ambiguous,

11   incomplete hypothetical.

12        THE WITNESS:  The industry has accepted

13   methodologies for measuring how many Facebook clicks

14   have been clicked through by how many people, how many

15   links were opened, how many views were generated, and

16   those analysis have been submitted to a number of

17   Courts as part of a number of many social media

18   campaigns as part of notice and have been accepted by

19   numerous Courts.

20   BY MS. STAGG:

21        **Q.   Have you yourself ever performed that**

22   **analysis of the methodologies for social media?**

23        A.   No.  I'm not a media expert.

24        **Q.   Okay.  You're relying on other persons or**

25   **other companies to provide that analysis?**

1    A.    A.B. Data has its own in-house media expert.

2  When we are retained -- actually two.   When we are

3  retained, those expert work -- those experts work on

4  our team to provide their own opinions.

5    Q.    Okay.  And can you tell me the names of

6  those -- is it more than one person?

7    A.    Linda Young, Vice President Of Media;

8  Heather Marsh, Vice President Of Digital Media.

9    Q.    I have the same question for you with regard

10  to e-mail notice.  Would you say that's similar?   In

11  other words, similar analysis of trying to see e-mails

12  that are opened or delivered or not rejected --

13    A.    That's correct.

14    Q.    -- to determine whether the notice has been

15  made?

16    A.    That's correct.

17    Q.    Okay.  And then my last question on that

18  topic:  With regard to notice by publication through

19  -- I'll say print or online as opposed -- as opposed

20  to a direct message to someone by e-mail or U.S. mail,

21  so I'm talking about publication either in a

22  traditional newspaper or -- or what I understand, you

23  know, to be typical online notification through

24  websites of news organizations, you're familiar with

25  that type of notice?

1    A.    Yes.

2    Q.    Okay.  How -- in those cases, how are you

3  assessing reach to the class member to achieve that

4  75 percent or greater notice?

5    A.    Based on the reach and frequency formula.

6    Q.    Okay.  And can you explain a little bit what

7  that means?

8    A.    I'm not a media expert.

9    Q.    Okay.  Would that be Linda Young in your

10  organization?

11    A.    That's correct.

12    Q.    Okay.  And possibly Heather Marsh as well?

13    A.    She would be focusing on digital media.

14    Q.    Okay.  All right.  And in reaching that

15  75 percent or greater notice class members, are -- is

16  that a total based on all of those forms of notice

17  that we just discussed, cumu- -- as opposed to each

18  segment?  In other words, are you trying to reach

19  75 percent or more total through the campaign of

20  notice as opposed to each segment or type of notice?

21    A.    Through a campaign of notice.

22    Q.    Okay.  So the 75 percent or greater, you

23  know, you may expect more notice, a higher percentage,

24  for example, with e-mail or U.S. mail versus

25  publication, correct?

**Anya Verkhovskaya**                          **Roberts vs. Wyndham International, Inc.**

1       A.    It depends whether the information is

2   available or needed.   Sometimes --

3       Q.    Okay.

4       A.    -- we have a very solid mailing list and no

5   other utili- -- no other methods of notice is

6   utilized.

7       Q.    Okay.   Thank you for that.

8            Let me change focus a little bit and talk

9   about this case specifically and the work that you

10  have performed.

11           Can you tell me what work you have done to

12  date in the case generally?

13      A.    Prepared a declaration.

14      Q.    Did you -- in your declaration -- because

15  I'm trying to keep the deposition short -- have you

16  identified all the materials that you reviewed to

17  support your opinion in this case?

18      A.    Yes.

19      Q.    Okay.  And I understand Mr. Bernstein has

20  produced an e-mail, and I'll take a look at it before

21  we end and ask any questions, but I just want to be

22  clear, there's nothing else that you have relied upon

23  in stating your opinions here today other than what's

24  identified in your declaration and possibly this

25  additional e-mail, correct?

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

1        A.    That's correct.

2        Q.    Okay.  Did you -- have you performed any --

3    or A.B. Data -- so I say "you" or your company -- have

4    actually done any research on the plaintiff Joyce

5    Roberts in this case?

6        A.    No.

7        Q.    Okay.  Have -- so you haven't attempted to

8    determine whether or not the phone numbers that are at

9    issue relating to Miss Roberts link her to those phone

10   numbers through any database that A.B. Data would use

11   in this case?

12       A.    Correct.

13       Q.    Okay.  Have you tried to test or sample any

14   of the telephone numbers at issue in this case to

15   determine what results you would get to identify or

16   ascertain the class members?

17       A.    No.

18       Q.    Okay.  So your opinion as to the methodology

19   that would be used has not been utilized yet in this

20   case by A.B. Data?

21       A.    Correct.

22       Q.    Have you reviewed the expert declaration of

23   plaintiffs' other experts, Randall Snyder or Thomas

24   Ladd?

25       A.    No.

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

1        Q.    Now, in this particular case, you are

2    proposing that if given a list of telephone numbers as

3    to the telephone -- the inbound caller who contacted

4    my client, in this case through their call center, you

5    could analyze those call records to identify the class

6    members, correct?

7        A.    Correct.

8        Q.    Okay.  Now, in paragraph 9 of your

9    declaration, on page 2, you're talking generally about

10   A.B. Data's experience in analyzing call records

11   similar to what would be used in this case, correct?

12       A.    Correct.

13       Q.    All right.  And you're testifying in your

14   declaration that A.B. Data would have -- would partner

15   or regularly partner with data vendors to -- what you

16   call data processors in your declaration to provide

17   information that would assist in identifying the class

18   members in this case, correct?

19       A.    Correct.

20       Q.    All right.  Have you identified a data

21   processor or data processors that you intend to use in

22   this case if this case is certified?

23       A.    We are currently thinking that the best

24   vendor would be LexisNexis, as described in

25   paragraph... (reviewing document) in paragraph 16.

Page 32

1    However, it is possible that after receiving and

2    reviewing the data, we would recommend a different

3    vendor.

4        Q.    Okay.  Can you explain for me why, at this

5    point in time, you would be inclined to work with

6    LexisNexis?  What about LexisNexis -- so have you

7    chose them or selected them to use in this case?

8        A.    They are our vendor of choice for this type

9    of data processing.

10       Q.    And why is that?

11       A.    They're easy to use, the turnaround time is

12   acceptable to us, their pricing is good and the

13   quality of work is acceptable to us.

14       Q.    Okay.  And when you say "quality of work,"

15   what do you mean by that?

16       A.    Um... if we submit files that have corrupted

17   fields, they pick up the phone and give us a call.

18   They're easy to work with.  The data that they produce

19   back is easy to read and understand, um...

20       Q.    Anything else?

21       A.    Um... it's one of the databases that we have

22   tested in -- extensively and that's all of the

23   reasons.

24       Q.    When you say "tested extensively," have you

25   ever done any analysis of the LexisNexis database to

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

```
 1   determine whether the identity of the class members
 2   correlates to the phone -- let me strike that.  That's
 3   actually not a good question.
 4          Do you know how accurate the LexisNexis
 5   database is for i- -- linking a person to a phone
 6   number?
 7      A.   86 to 97 percent.
 8      Q.   And 86 to 97 percent of -- of what?  What --
 9   what -- what is that result?
10      A.   The accuracy of the LexisNexis database
11   based on our testing.
12      Q.   Okay.  Accuracy of what?  What's the
13   variable?
14      A.   The variable?  There are two variables:
15   Cellular versus noncellular and name and address of
16   potential class members within a certain time period.
17      Q.   Okay.  So it's cellular or noncellular
18   phone, and in your experience with LexisNexis, that is
19   86 to 97 percent accurate?
20      A.   Correct.
21      Q.   Okay.  And then the other variable is the --
22   now, when you say "the potential class member," what
23   is your understanding of what information LexisNexis
24   is providing to you?
25      A.   Name and address.
```

**Page 34**

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

 1      Q.   Okay.  And name and address of?  Of what?

 2      A.   Of a user of that particular phone within a

 3   certain time frame.

 4      Q.   When you say "user of a particular phone,"

 5   what do you mean by that?

 6      A.   Subscriber.

 7      Q.   Subscriber.  So it's the person who owns or

 8   subscribes to the service connected to that telephone

 9   number?

10      A.   If that's what we are asking them to provide

11   to us, yes.

12      Q.   Okay.  In any cases that you have worked on,

13   have you asked them to identify the specific caller

14   versus the subscriber or owner?

15      A.   They can provide a list of potential users,

16   but they have no means to know who actually made the

17   phone call.

18      Q.   What's your understanding of what the

19   potential users are?

20      A.   Family plans, friends and family.  There are

21   many criteria that could be used.

22      Q.   Okay.  So these are people who are somehow

23   on the subscriber's account linked to the account?  Is

24   that your understanding?

25      A.   If that's what we ask for, they have that

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

1    service as well.

2        Q.    Okay.  So that would be some additional

3    level of research that LexisNexis would have to do?

4        A.    Correct.

5        Q.    Okay.  And do you attribute that same level

6    of 86 to 90 percent accuracy as to that second

7    variable, the name and address of the subscriber or

8    owner?

9        A.    86 to 97 relates to the subscriber

10   information, not to friends and family.

11       Q.    Okay.  And friends and family, do you have a

12   different understanding of the level of accuracy as to

13   that particular data point?

14       A.    I don't have a level of understanding.

15       Q.    Okay.  None whatsoever?

16       A.    Not for that level of service.

17       Q.    Okay.  You have -- and again, so you would

18   agree, though, that you believe less -- LexisNexis is

19   providing 86 to 90 percent level of accuracy as to the

20   name and address of the subscriber?

21       A.    97 --

22            MR. GROVER:  Objection, misstated the

23   statistic.

24            MS. STAGG:  I didn't -- I'm sorry, go ahead.

25            I -- I didn't hear what Eric said.

```
 1            MR. GROVER:  I said:  I believe you misstated
 2    the statistic in your question.
 3            MS. STAGG:  Okay.  Let me rephrase then.
 4    BY MS. STAGG:
 5        Q.   Well, let me ask it this way:  What level of
 6    accuracy, if any, do you ascribe to LexisNexis'
 7    results for that second variable, name and address of
 8    subscriber?
 9        A.   86 to 97 percent.
10        Q.   And what do you base that statistic on, your
11    own analysis of the results, or an industry standard?
12            MR. GROVER:  Objection, compound.
13            THE WITNESS:  Our own analysis of results.
14    BY MS. STAGG:
15        Q.   Okay.  And what analysis do you do to verify
16    that level of accuracy?
17        A.   We submit a list of known subscribers and
18    compare the results.
19        Q.   So your -- your level -- the level of
20    accuracy relates to information you already have?  I'm
21    not sure I understand.
22        A.   We have a list of phone numbers.  We
23    research and understand who the subscribers were and
24    their addresses.  Then, we ran that list against
25    LexisNexis database, come up with the results and
```

 1   compare the results to the actuals.

 2        Q.   All right.  So you're -- you've done that

 3   how many times?

 4        A.   We do this few times a year, going back

 5   three years.

 6        Q.   Okay.  When you say a "few times a year,"

 7   what do you mean?

 8        A.   Um, every three to five months we try to run

 9   that test.

10        Q.   Okay.  And how big is the sample?

11        A.   It varies from a hundred to a few hundred

12   records.

13        Q.   And where are you getting the information

14   about the list of known subscribers that you're --

15             THE REPORTER:  I'm sorry, I didn't hear the

16   end of your question, Counsel, about the list of known

17   subscribers.

18   BY MS. STAGG:

19        Q.   Yeah, let me restate.

20             Where are you getting the list of known

21   subscribers that you're testing against the LexisNexis

22   database?

23        A.   Research, friends and family, company

24   employees, volunteers.

25        Q.   And do you do that yourself?

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

1      A.    No.

2      Q.    Okay.  Who at A.B. Data compiles that list

3   that you're referring to?

4      A.    I work with several individuals, but the

5   person who oversees that process is Christina Peters.

6      Q.    Okay.  And so you test this list of known

7   subscribers -- and are these all -- what types of

8   telephones are these?  All cellular?  Cellular land

9   line?  Cordless?

10     A.    It varies.  All across the board.

11     Q.    And then you are comparing what you know to

12  be accurate subscribers linked to certain phone

13  numbers, correct?

14     A.    Correct.

15     Q.    Okay.  And then now you're running it in the

16  LexisNexis database to determine how accurate their

17  results are, correct?

18     A.    Correct.

19     Q.    All right.  And that's where you're seeing

20  an 86 to 90 percent level of accuracy?

21          MR. BERNSTEIN:  That misstates the numbers.

22  BY MS. STAGG:

23     Q.    I'm sorry, 86 to 97 percent level of

24  accuracy?

25     A.    That's correct.

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

1      Q.    Okay.  And why had -- did you start doing

2   this in the last several years?

3      A.    I started doing it out of my own curiosity,

4   and then it seemed that our clients have been asking

5   that question, so we continued doing it.

6      Q.    Okay.  Have you ever done it for the

7   March 2011 to the March 2012 time frame?

8      A.    I don't know.

9      Q.    Okay.  In other words, do you recall making

10  any determination about how reliable the LexisNexis

11  database is currently to review subscribers -- to

12  identify subscribers of certain telephone numbers

13  during that March 1st, 2011 through March 23, 2012

14  time frame that's at issue in this case?

15      A.    I don't know.

16      Q.    Okay.  Do you have any understanding as to

17  how accurate the LexisNexis database is for that

18  period of time?

19      A.    I see no reason why it would vary.

20      Q.    Apart from that comparison process that you

21  just described with regard to -- oh, let me ask this:

22  Have you ever done that same type of comparison

23  analysis for any of the other data processor companies

24  that you have used?

25      A.    No.

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

1        Q.    Do you have any personal understanding as to

2    how the information that LexisNexis has in its

3    database is acquired?

4        A.    Yes.

5        Q.    Can you tell me what that is?

6        A.    Since 19 -- late 1930's, I believe,

7    LexisNexis is compiling data from a variety of public

8    and private sources linked by its proprietary linking

9    methodology.

10       Q.    Do you know anything about their proprietary

11   linking methodology?

12       A.    I know it exists and it links individuals

13   and records in certain ways to allow -- run various

14   complex queries.  That's all I know.

15       Q.    And apart from the testing that A.B. Data

16   company has done of those samples over the last few

17   years as you just described, has A.B. Data done any

18   additional analysis of the accuracy of LexisNexis'

19   records to identify a telephone caller based on a

20   telephone number?

21       A.    No.

22       Q.    Now, in paragraph 17 of your declaration,

23   you've described a process to, as you say, "report for

24   a given telephone number an overview of ownership

25   records dating back at least ten years."  Do you see

1     that?

2          A.    Yes.

3          Q.    Okay.  And your -- your methodology that's

4     being proposed here would be used to identify the

5     owner, or as you testified earlier, the subscriber for

6     a particular telephone number, correct?

7          A.    Correct.

8          Q.    Is there anything in your process that would

9     lead to identifying a specific caller or user of --

10    well, let me -- let me try it this way:  Is there

11    anything in your process that will identify through

12    records as opposed to self-identification?  So let's

13    exclude self-identification for the moment.  We'll get

14    back to that.

15                Is there anything in your process that will

16    actually identify who called Wyndham based on the

17    telephone number that may be provided in this case?

18         A.    No.

19         Q.    So your opinion is that it's possible to

20    identify who the owner or subscriber is of that

21    telephone number account if given a telephone number,

22    correct?

23         A.    Well, partially correct.

24         Q.    Okay.  Tell me what I said that's wrong.

25         A.    In your previous question, you excluded

1   self-identification.

2        Q.   Right.   Right.   So at the end of the day,

3   your methodology relies in reaching out to the owner

4   or subscriber of the telephone account to provide

5   notice about the case, correct?

6        A.   Well, if that's what's decided within a

7   certain time frame by the Court.

8        Q.   Sure.   In other words, your process that

9   you're proposing would lead to -- if it is as accurate

10   as you believe it to be based on your experience,

11   would lead to the owner or subscriber of the telephone

12   number that's at issue but not the -- but not

13   necessarily the identity of the caller?

14        A.   That's correct.

15        Q.   Okay.   And have you ever done any analysis

16   in any case to determine how close -- well, again, let

17   me -- let me ask a different question.

18        Have you done any analysis to determine how

19   likely it is that the subscriber or owner of a

20   telephone number is a caller on a given call?

21        A.   No.

22        Q.   Now, in connection with the cordless class

23   proposed here, you've identified, in paragraph 26

24   through 27 of your declaration, a process to

25   coordinate self-identification of cordless telephone

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

```
 1        A.    Yes.

 2        Q.    And what's that?

 3        A.    70 percent.

 4        Q.    Okay.  So it -- you would say it's the same

 5   as the outreach campaign that you're identifying here?

 6        A.    It is.  The class is California residents of

 7   18 years of age or older, includes -- it's

 8   overinclusive class, but it includes potential class

 9   members.

10        Q.    What do you mean by "overinclusive class"?

11        A.    This outreach campaign would have a reach of

12   70 percent of adults 18 years of age or older in

13   California, which means that 70 percent of California

14   adults 18 years of age or older would be exposed.  So

15   that means that 70 percent of potential class members,

16   plus others who are 18 years of age or older in

17   California will be exposed as well to that notice.

18        Q.    Okay.  And so you -- you believe that that

19   particular aspect of the program would actually

20   identify more than the proposed class members?

21             MR. GROVER:  Objection to the use of the word

22   "identify" when the witness is describing exposure.

23   BY MS. STAGG:

24        Q.    Okay.  So it's not -- it's just the

25   70 percent would just be exposing the general public
```

**Page 46**

Anya Verkhovskaya                    Roberts vs. Wyndham International, Inc.

```
 1   to information about the class, but it's not
 2   necessarily designed to identify that same level of
 3   class members?
 4       A.   The additional outreach includes
 5   supplemental methodologies for informing the class.
 6       Q.   But in this case, you're tasked with
 7   identifying the class.  So in your mind, is there any
 8   difference?
 9       A.   Yes.  If this additional outreach is used,
10   that would result in 70 percent of exposure and then
11   followed up by self-identification of potential class
12   members.
13       Q.   I'm going to try to finish up here brief- --
14   in a minute.
15           Do you agree that your proposed methodology
16   in this case could lead to including people who should
17   not be included in the class?
18           MR. GROVER:  Objection, vague and ambiguous.
19           THE WITNESS:  Could you read that question,
20   please, one more time?
21           THE REPORTER:  Sure.
22                     (Record read.)
23           MR. GROVER:  Again, objection.  I don't
24   understand -- I don't understand the question.  I don't
25   know if the witness does.
```

**Page 47**

**Anya Verkhovskaya**                        **Roberts vs. Wyndham International, Inc.**

```
 1              THE WITNESS:  Could you please clarify?  What
 2   do you mean by "include"?
 3   BY MS. STAGG:
 4       Q.   Sure.  In this case you are proposing a
 5   methodology that would include self-identification
 6   with regard to the cordless class, correct?
 7       A.   Correct.
 8       Q.   Okay.  And you -- you agree with me, you're
 9   not aware of a database that would allow us to
10   identify who a cordless -- who is using a cordless
11   telephone, correct?
12       A.   Correct.
13       Q.   Okay.  So the database, as you testified
14   earlier, based on your experience, can be identified
15   by cellular versus noncellular, correct?
16       A.   Correct.
17       Q.   Okay.  But they can't be identified land
18   line versus cordless or cellular versus cordless,
19   correct?
20       A.   Not completely.
21       Q.   Okay.  What do you mean?
22       A.   Well, cordless is a land line.
23       Q.   Yeah.  I'm -- I'm sorry.  What I mean is,
24   you cannot distinguish past a land line in the data
25   process or databases that you use, correct?
```

**Page 48**

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

1        A.    Correct.

2        Q.    Okay.  And so from the databases that you

3    have available to you, you cannot ascertain who a

4    cordless telephone user is?

5        A.    Correct.

6        Q.    So to do that, you would have to give notice

7    to the land line owners or subscribers from those

8    databases and then have them self-identify as to

9    whether or not they used a cordless phone?

10        A.    Correct, with the exception of the term

11    "notice."  It could be a survey.

12        Q.    Sure.  I'm using that as a general term, not

13    necessarily a legal term.

14             But the point is, the individual would have

15    to self-identify into the cordless class, correct?

16        A.    Correct.

17        Q.    And what methodology or process, if any, are

18    you proposing --

19             (Cell phone ringing.)

20             MS. STAGG:  Ooh, that's ugly.

21             MR. BERNSTEIN:  Sorry.

22             MR. GROVER:  That means time's up.

23             MS. STAGG:  Almost, almost.

24    BY MS. STAGG:

25        Q.    What -- let's go back.

**Anya Verkhovskaya**                          **Roberts vs. Wyndham International, Inc.**

1       What methodology or process are you

2   proposing, if any, to verify whether the persons who

3   self-identify into the cordless class are properly in

4   the class?

5       A.   Whatever counsel, both sides, will agree

6   upon.

7       Q.   Okay.  Anything else?

8       A.   No.

9       Q.   All right.  Is there anything in your --

10  that you're aware of that you, A.B. Data, can access

11  through the data processors that would provide the

12  physical location of the caller at the time the call

13  was made to defendant in this case?

14       MR. GROVER:  Call -- any caller or cell

15  callers?

16  BY MS. STAGG:

17       Q.   Well, let's start -- there's a cellular

18  class in this case, correct?

19       A.   Correct.

20       Q.   Okay.  Focusing on this cellular class or

21  proposed class, is there any information that A.B.

22  Data can obtain directly or through the data

23  processors that will allow A.B. Data to identify the

24  physical location of the cellular caller when they

25  called defendants?

**Page 50**

 1      A.    Yes.

 2      Q.    What is that?

 3      A.    If the Court issues a subpoena to cellular

 4  companies to provide that information.

 5      Q.    Okay.  And that -- that would be the only

 6  way that you would understand that physical location

 7  variable to be available to A.B. Data?

 8      A.    I don't know if other methods are available

 9  through the government agencies.  I'm not aware of the

10  methods they use, but they do use those methods in

11  criminal investigations.

12             THE WITNESS:  Nancy, hello?

13             MR. BERNSTEIN:  Nancy, are -- are you able to

14  hear us?

15             MR. GROVER:  I'm here.

16             MR. BERNSTEIN:  And it looks like Nancy's

17  dialing a phone.

18             MR. GROVER:  Okay.  We'll just wait for her

19  to pop back up.

20             MS. STAGG:  Hi, it's Nancy.

21             MR. BERNSTEIN:  Who?

22             MR. GROVER:  We just had it wrapped up.

23             MS. STAGG:  Yeah, I figured.

24             For whatever reason, my phone just died.  So

25  I have to redial in.  Can you hear me okay.

**Anya Verkhovskaya**                              Roberts vs. Wyndham International, Inc.

```
1              THE WITNESS:  Yes.

2              MR. GROVER:  Yes.

3              MR. BERNSTEIN:  Actually, this is probably

4     the best you've sounded.

5              MS. STAGG:  Could I just have the court

6     reporter read back Miss Verkhoskaya's response to my

7     last question and we'll pick up there?

8              THE REPORTER:  Sure.  Last question...

9              (Record read as follows:

10     "Q.  And that would be the only way that you would

11   understand that physical location variable to be

12   available to A.B. Data?

13      A.   I don't know if other methods are available

14    through the government agencies.  I'm not aware of the

15    methods they use, but they do use those methods in

16    criminal investigations.")

17             MS. STAGG:  Okay.  Thank you.

18             THE REPORTER:  You're welcome.

19   BY MS. STAGG:

20       Q.  Have you ever obtained those types of

21    records from a subpoena to a telephone company in any

22    other class action?

23       A.   No.

24       Q.  I know that you have provided --

25             MS. STAGG:  Let me do this:  Because I'm near
```

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

```
 1        I, the undersigned, a Certified Shorthand Reporter

 2   of the State of Illinois, do hereby certify:

 3            That the foregoing proceedings were taken

 4   before me at the time and place herein set forth; that

 5   any witnesses in the foregoing proceedings, prior to

 6   testifying were duly sworn; that a record of the

 7   proceedings was made by me using machine shorthand,

 8   which was thereafter transcribed under my direction;

 9   that the foregoing transcript is a true record of the

10   testimony given.

11        Further, that if the foregoing pertains to the

12   original transcript of a deposition in a federal case,

13   before completion of the proceedings, review of the

14   transcript [X] was [ ]  was not requested.

15

16            I further certify I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney or party to this action.

19            IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: June 11, 2015

23

24   _____

25        Deborah Habian
          RMR, CRR, CLR, CSR. No. 084-02432
```

**Page 65**

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2   Case Name: Roberts vs. Wyndham International, Inc.

 3   Date of Deposition: 06/02/2015

 4   Job No.: 10016952

 5

 6              I, ANYA VERKHOVSKAYA, hereby certify

 7   under penalty of perjury under the laws of the State of

 8   _____ that the foregoing is true and correct.

 9              Executed this _____ day of

10   _____, 2015, at _____.

11

12

13                    _____

14                    ANYA VERKHOVSKAYA

15

16   NOTARIZATION (If Required)

17   State of _____

18   County of _____

19   Subscribed and sworn to (or affirmed) before me on

20   this _____ day of _____, 20__,

21   by_____,    proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____ (Seal)

25
```

**Page 66**

```
1    DEPOSITION ERRATA SHEET

2    Case Name: Roberts vs. Wyndham International, Inc.
     Name of Witness: Anya Verkhovskaya
3    Date of Deposition: 06/02/2015
     Job No.: 10016952
4    Reason Codes:  1. To clarify the record.
                    2. To conform to the facts.
5                   3. To correct transcription errors.

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24   Page _____ Line _____ Reason _____

25   From _____ to _____
```

**Page 67**

**Anya Verkhovskaya**                    **Roberts vs. Wyndham International, Inc.**

```
1    DEPOSITION ERRATA SHEET

2    Page _____ Line _____ Reason _____

3    From _____ to _____

4    Page _____ Line _____ Reason _____

5    From _____ to _____

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   _____ Subject to the above changes, I certify that the
              transcript is true and correct
23   _____ No changes have been made. I certify that the
              transcript  is true and correct.

24

25            _____
                        ANYA VERKHOVSKAYA
```