Pages 1 - 29

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

RICHARD WUEST on behalf of      )
himself, and all others         )
similarly situated individuals,)
                                )
            Plaintiff,           )
                                )
  VS.                           )        No. C 18-3658 WHA
                                )
MY PILLOW, INC.; and DOES 1     )
through 50, inclusive,          )
                                )
            Defendant.           )
_____)        San Francisco, California
                                         Thursday, July 11, 2019


<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiff:          KELLER GROVER LLP
                        1965 Market Street
                        San Francisco, California 94103
                   BY:  **ERIC A. GROVER, ESQ.**

For Defendant:          BESHADA FARNESE LLP
                        11601 Wilshire Boulevard, Suite 500
                        Los Angeles, California 90025
                   BY:  **PETER J. FARNESE, ESQ.**

                        BESHADA FARNESE LLP
                        108 Wanaque Avenue
                        Pompton Lakes, New Jersey 07442
                   BY:  **DONALD A. BESHADA, ESQ.**

Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
               Official Reporter - U.S. District Court

**Thursday - July 11, 2019**                                    **8:32 a.m.**

### P R O C E E D I N G S

---oOo---

**THE CLERK:**  Calling civil action 18-3658, Wuest versus My Pillow, Inc.

Counsel, please step forward and state your appearance for the record.

**THE COURT:**  Appearances, please.

**MR. BESHADA:**  Good morning, Your Honor.  Donald Beshada, Beshada Farnese, for defendant My Pillow.

**MR. FARNESE:**  Good morning, Your Honor.  Peter Farnese for defendant My Pillow.

**MR. GROVER:**  Eric Grover, plaintiff.

**THE COURT:**  Thank you.

I'd like to go through the questions that I sent out.  And let's try to see if you have easy-to-get answers.

The first question was:  Has plaintiff ever obtained -- I'm talking about Mr. Wuest now.

Has Mr. Wuest ever obtained a class settlement, CIPA or otherwise, in which cash members received cash and/or injunctive relief?

**MR. GROVER:**  Your Honor, if it's easier, I prepared a written response to all of them, that I can hand out, that we could go through.

**THE COURT:**  Let me see your written response.

1      **MR. GROVER:**  I'll give a copy to counsel.

2      **THE COURT:**  Does it actually answer the questions?

3      **MR. GROVER:**  Yes.

4      **THE COURT:**  All right.  Well, good.  I'm looking at

5  your -- so you say, "Answer: No."

6      **MR. GROVER:**  I have a couple extra, if you would like,

7  for the clerks.

8      **THE COURT:**  Hand it to my clerk.

9      All right.  So Question 2:  In each of plaintiff's prior

10  CIPA class actions, how many of plaintiff's calls were alleged

11  to have been recorded without consent?

12      All right.  So you have a chart here.  And these are

13  the -- all right.  This is what's actually alleged in the

14  complaint itself; is that correct?

15      **MR. GROVER:**  In all the complaints the actual number

16  of calls wasn't alleged, but that was the number of calls.

17      **THE COURT:**  That didn't answer my question.  Looking

18  only at the four corners of the complaint, did -- I want to

19  know what the complaint itself said.

20      **MR. GROVER:**  I don't believe the *Clearwire* complaint

21  alleged all ten calls.  It just said there was a series of

22  calls.  But there was approximately ten.

23      The other complaint --

24      **THE COURT:**  How do we know that?

25      **MR. GROVER:**  Well, because --

1          THE COURT:  How do we know there were approximately

2     ten?

3          MR. GROVER:  Because when we litigated the case, we

4     had his phone records.

5          THE COURT:  What did the complaint say?

6          MR. GROVER:  I don't recall exactly what that

7     complaint said from 2012.  I looked back through materials

8     related to the number of calls.

9          THE COURT:  What do you say is the answer?

10         MR. BESHADA:  To Question 2?

11         THE COURT:  Yeah.

12         MR. BESHADA:  I have no reason to doubt that what he

13    says here is accurate.  In this particular case that we had,

14    Mr. Wuest is claiming five calls that were inappropriate.

15         THE COURT:  What?

16         MR. BESHADA:  Mr. Wuest, in this particular case, is

17    claiming five calls inappropriately --

18         THE COURT:  What case?  You mean our immediate case,

19    the instant case?  I'm asking about the prior cases.

20         MR. BESHADA:  Your Honor, I would only say that it

21    seems that we didn't get to that information in discovery.  And

22    it would seem that if I cross-reference the chart that

23    Mr. Grover has in this particular pleading with the chart that

24    he had given us during discovery, if you multiply the number of

25    calls by 5,000 it would seem that what he's putting on this

 1   particular sheet seems to mirror what that document showed.

 2        To be clear, Your Honor, the only discovery that we've

 3   gotten on these particular cases are the chart and a

 4   representation from counsel and from Mr. Wuest that none of the

 5   agreements that are reflected in this contain any class relief

 6   or any injunctive relief for the class.

 7        **THE COURT:**  All right.  Well, in the -- let's go

 8   through this, then, for a second.

 9        In the *Clearwire* case, case number 5061, what was the

10   settlement amount for Mr. Wuest?  What was the amount for the

11   lawyer?

12        **MR. GROVER:**  Right.  With regard to that, I have a

13   chart that has the information.  I'm not -- I'm not willing to

14   read it into the record because it's subject to a

15   confidentiality agreement.  I'll provide it to the Court.

16        **THE COURT:**  Well, I'm going to make it public.

17        **MR. GROVER:**  Okay.  Well, I told the lawyers.  You

18   asked about the meet and confer in the first paragraph before

19   the numbers.  I told the lawyers about your request and that we

20   were having a hearing today at 8:00 a.m.

21        **THE COURT:**  Let me see your chart.

22     Have you seen this?

23        **MR. BESHADA:**  I have not.

24        **MR. GROVER:**  Because it's all, again, subject to --

25   the ones that were not -- that have been added, because they

1  were not in what was originally produced, were all because

2  those counsel did not agree.

3         **THE COURT:**  All right.  Well, look, all right.  So it

4  says here 5,000 went to Mr. Wuest, 15,000 went to you.

5         **MR. GROVER:**  Correct.

6         **THE COURT:**  Now, the next one on your list you just

7  gave me is *BP Ventures*.

8         **MR. GROVER:**  That's not a call recording case, so I

9  didn't put it in the chart.

10        **THE COURT:**  All right.  So the next one is *Complete*

11 *Recovery*.  Is that the next one here?

12        **MR. GROVER:**  Yes, correct.

13        **THE COURT:**  All right.  So on your -- it says that was

14 $10,000 to Wuest and 70,000 to you.

15        **MR. GROVER:**  Correct.

16        **THE COURT:**  Then *Wuest v. Comcast Cable*, is that the

17 next one?

18        **MR. GROVER:**  Correct.

19        **THE COURT:**  That one says 15,000 to Wuest, 175,000 to

20 you.

21     *PepsiCo*, 10,000 to Wuest, 25,000 to you.

22     *Guitar Center*, 2500 to Wuest, 2500 to you.

23     *Purity Products*, 15,000 to Wuest, 55,000 to you.

24     *NIU*, 10,000 to Wuest, 65,000 to you.

25     I don't see *Icon* on here.

1          **MR. GROVER:** That's *NordicTrack*. That's -- I have it

2  listed there by the product.

3          **THE COURT:** Let's see. Okay. That's still in

4  litigation.

5          **MR. GROVER:** Correct.

6          **THE COURT:** And then *As Seen On TV* that is 5,000 Wuest

7  and 5,000 to you.

8      And then *Augusta*, 10,000 and 42,500.

9      I want to make it very clear that the Court, this court,

10  meaning me, I'm overruling any of those confidentiality claims.

11  And the reason for that is that I think there's a serious

12  problem here that concerns the use of a class allegation to

13  expropriate to the individual plaintiff and the lawyer a

14  premium by putting extra pressure on the defendant on account

15  of the class allegations.

16      Now, the class winds up getting zero. There is no class.

17  All of the premium that might have gone to the class goes to

18  the named plaintiff and the lawyer. And that, to me, is a

19  serious problem. And this chart that you gave me deserves to

20  be made public because I think it may show exactly that.

21          **MR. GROVER:** Well, if I'm allowed to respond.

22          **THE COURT:** Go ahead. I want --

23          **MR. GROVER:** It's not --

24          **THE COURT:** What?

25          **MR. GROVER:** It's not accurate, first of all, to say

1   there was a premium, because overall the total amount of

2   lodestar spent on all those cases exceeds the amount of fees

3   that were paid.

4       Each individual case has to stand on its own merits.  When

5   we file a case --

6           THE COURT:  What is the basis for attorneys' fees in

7   these cases?  There's --

8           MR. GROVER:  In these particular cases they were

9   negotiated settlements.

10          THE COURT:  But there is no statute, that I can find,

11  that authorizes attorneys' fees.

12          MR. GROVER:  Well, under California -- that's one of

13  your questions, and I have a discussion --

14          THE COURT:  What is it?

15          MR. GROVER:  C.C.P. 1021.5.

16          THE COURT:  All right.  Read that to me.

17          MR. GROVER:  It goes on for a page and a half.  Or a

18  page.  Do you want me to read it?  It's the response to

19  Question Number 3.

20          THE COURT:  It says, "In any action which has resulted

21  in the enforcement of an important right affecting the public

22  interest."

23      Okay.  Well, let's look at 1021.5.  I don't have that

24  here.  Can my law clerk give me the C.C.P.?

25          MR. GROVER:  That would be -- that's what we put in

1  the prayer for relief, and it's what we would be seeking in

2  terms of the case settling on a class.

3          **MR. BESHADA:**  Your Honor, we have an extra copy.

4          **MR. GROVER:**  When we file a case and then we learn

5  facts that make it such that we can't continue as a class

6  action, there is -- we settle the case.  We have to move on.

7       I can't -- it's not ever our intent to file a case and not

8  have it be a class action.  That's not the business model we

9  operate under.  It's disappointing when we learn facts that

10  don't allow it to continue as a class action.

11          **THE COURT:**  In every single case?

12          **MR. GROVER:**  Of these cases.  I've settled many --

13          **THE COURT:**  How many of these CIPA cases has Mr. Wuest

14  ever been able to get certified?

15          **MR. GROVER:**  Mr. Wuest, no.  Mr. Wuest is -- I don't

16  know what to say other than it's completely unusual in terms of

17  all his cases have turned out to have odd facts.

18       But when an arbitration agreement pops up that has a class

19  action waiver, I mean, the *Comcast* one, we litigated that up

20  through the Ninth Circuit Court of Appeals, up to oral

21  argument.

22       I was involved in working with Public Justice to try and

23  overturn the arbitration agreement.  I spent $175,000 in

24  lodestar working on it.  And I was told that there was a very

25  low probability of overturning it.  And there were issues in

1    the arbitration agreement that could have created some very bad

2    law for other plaintiffs.  So I have an obligation not to go

3    forward on a case that is not going to work or be harmful.

4         The *Guitar Center* case, even though the call center

5    representatives were saying the calls were being recorded,

6    *Guitar Center* was able to demonstrate they were not recording

7    them and it was a mistake by the call center people.  I can't

8    go forward in a case like that.

9         In the *Augusta Precious Metals* case, it turned out there

10   was a very tiny number of calls.  There is not an opportunity

11   to go forward on a class basis like that.

12        Each of these cases, it's bizarre that they are all

13   happening to the same person.  I grant you that.  He happens to

14   be a person that's aware of his rights under this law, from

15   being a class member in another case back in 2010, so he's

16   alerted to the issue more than people in the general public.

17        But all of these settlements on an individual basis, it's

18   a disappointment frankly.  This is not how we're trying to

19   litigate the cases.

20        We're here today with a class certification motion because

21   in this case we didn't have these issues that were -- happened

22   in those cases.

23             THE COURT:  Is there any decision, ever, where under

24   the CIPA, Section 1021.5 was used to award attorneys' fees?

25             MR. GROVER:  I'm not aware of any that have gone

1   through trial.  So the cases that settled, people were

2   collecting fees based on the common fund period.

3           THE COURT:  No.  I'm asking, is there any decision in

4   the history of the universe which has expressly said you can

5   collect fees, attorneys' fees, under 1021.5 in a CIPA case?

6           MR. GROVER:  I don't have an answer to that.

7           MR. BESHADA:  We have been able to find none, Your

8   Honor.

9           MR. GROVER:  It's a statute of general application.

10  It's not specific to CIPA or any other statute.

11      I want to be clear, because it's on the record I'm being

12  accused essentially of wrongdoing.

13          THE COURT:  I'm coming pretty close to that.  I want

14  to give you a fair chance here, but I want to be frank about

15  it.  I practiced for almost 25 years, and I've been in this job

16  20 years.  And I believe strongly in the value of class

17  actions.

18          MR. GROVER:  As do I.

19          THE COURT:  And I've never seen a case where

20  somebody -- I've seen occasionally where somebody gets a

21  premium by alleging, but it's rare.  Most plaintiff's lawyers

22  in your position actually go through the process.

23          MR. GROVER:  Well --

24          THE COURT:  And you haven't here.

25          MR. GROVER:  I don't understand "go through the

 1   process."

 2          **THE COURT:**  You've never taken Mr. Wuest through a

 3   single class action.  It's always settled for a premium.

 4          **MR. GROVER:**  Well, you keep saying it settled for a

 5   premium.  I don't know what you mean by "a premium."

 6   *Guitar Center* is not a premium.  Some cases settled for

 7   the number of calls he had.  Some settled less; some settled

 8   more.

 9          Overall, he's recovered less than his calls times 5,000.

10   And overall I've recovered less than the fees and costs that I

11   put in the case.  You can pick out an example here and there

12   but --

13          **THE COURT:**  Let's go through 1021.5.  You have to meet

14   three things.  The first one is a significant benefit, whether

15   pecuniary or nonpecuniary, has been conferred on the general

16   public or a large class of persons.

17          Now, when we have an individual settlement, how can that

18   possibly be satisfied?

19          **MR. GROVER:**  I didn't say the individual settlements

20   were subject to any particular attorneys' fees provision.  The

21   individual settlements are based on what the parties agree to,

22   just like settlements that happen every day.

23          **THE COURT:**  Yeah.  And, see, the point is that in an

24   individual case, an individual CIPA case, there is no right to

25   attorneys' fees.  Zero.  And your lodestar doesn't make any

1  difference.

2      What matters is what the plaintiff can recover, and then

3  you get a percentage of that.  But you don't get attorneys'

4  fees in addition to that.  It's a buyoff.  It's a payoff.

5          **MR. GROVER:**  Well, I take exception to that.  It's not

6  true.

7          **THE COURT:**  It is true.

8          **MR. GROVER:**  It's not true.

9          **THE COURT:**  That's what you've been doing.

10          **MR. GROVER:**  No.

11          **THE COURT:**  That's what your career is.

12          **MR. GROVER:**  That is --

13          **THE COURT:**  At least with Mr. Wuest, that's what it

14  shows.

15          **MR. GROVER:**  I have settled dozens and dozens and

16  dozens of class actions.  I have put tens of millions, more

17  than that, of dollars in the pockets of employees and consumers

18  for many years.

19      I cannot be responsible for certain facts that come to

20  light once the case is filed.  I have an obligation not to

21  pursue a case through class certification that doesn't have a

22  basis for it.  And so we resolve the case and we move to the

23  next case.

24          **THE COURT:**  All right.  Let's continue with my

25  questions.

1    Before I leave that, though, did you have something on

2  your side you wanted to add or subtract to the questions I've

3  gone over yet so far?

4        **MR. BESHADA:**  No, Your Honor, other than I just point

5  out that 1021.5, the first two words of 1021.5 is "upon motion"

6  the Court may award reasonable attorneys' fees.  I don't know

7  whether motions were made in any of these cases to approve any

8  payment of attorneys' fees.

9        And then I would just like to point the Court to a case

10  called *Satrap* -- S-a-t-r-a-p -- *v. Pacific Gas & Electric*

11  *Company*.

12        And when talking about the private attorney general

13  statute, that court has a quote that says that private attorney

14  general fees -- this is not a quote -- are not intended to

15  provide insurance for litigants and counsel who misjudge the

16  value of their case and end up with a low verdict.

17        That's from the Rutter's guide.  The quote from the case

18  is:

19        "Rather, the purpose is to, quote, provide some

20        incentive for the plaintiff who acts as a true private

21        attorney general prosecuting a lawsuit that enforces an

22        important public right and confers a significant benefit

23        despite the fact that his or her own financial stake in

24        the outcome would not by itself constitute an adequate

25        incentive to litigate."

1          THE COURT:  What does it cite to, the decision?

2          MR. BESHADA:  It is *Satrap v. Pacific Gas & Electric*

3  *Company*, 42 Cal. App. 4th, 80.

4          THE COURT:  What page?

5          MR. BESHADA:  At 80.  That's the quote, is on page 80.

6          THE COURT:  All right.  Let's go to Question 4.  How

7  many CIPA cases has plaintiff litigated to and including...

8  refer back to none, see Question 1.

9          Question 5:  What case law or statutes allow the

10  aggregation of $5,000 statutory damages across the class?

11          MR. GROVER:  Both the statute, California case law,

12  and federal decisions interpreting California case law or

13  interpreting the statute, have all found that.

14          THE COURT:  What do you have to say to that one?

15          MR. BESHADA:  Number 5, Judge, the only case that

16  we've been able to find on a CIPA case is actually just a case

17  on class certification.

18      And it discusses the decision to look at the aggregation

19  in that particular set of circumstances as not something that

20  was looked at at the class certification stage but something

21  that the Court could look at after the class certification

22  stage.  That is a case involving *Omni Hotels* from the

23  Central District of California.

24      I think the facts of those particular cases are

25  significantly different.  And I would suggest that the facts of

1   this case are more inclined to the teachings of *Kline v.*

2   *Coldwell Banker*, which when you were looking at the type of

3   statutory aggregation liability that a company like My Pillow

4   has in this case, when you compare that to the actual harm to

5   the class, which in this particular case Mr. Wuest has

6   testified that he suffered no injuries, either physical,

7   mental, or emotional, that when you look at that testimony by

8   the class representative against a potential $87 million

9   aggregated statutory verdict here, in a situation where the

10  company had a policy of recording, made a mistake for a period

11  of time, that I think the teaching of *Kline*, the principle then

12  was if the aggregation of damages is so disproportionate to the

13  actual harm suffered by the class in the case -- and there is

14  no legislative history that suggests that that should be done

15  in a situation like this -- that the courts would say that on a

16  superiority analysis that the class action device is not the

17  superior method to adjudicate a case like this.

18          **THE COURT:**  Is that a Ninth Circuit decision?

19          **MR. BESHADA:**  Ninth Circuit decision.

20          **THE COURT:**  Right.

21          **MR. GROVER:**  Can I address that briefly?

22          **MR. BESHADA:**  There is a subsequent decision, Judge,

23  *Bateman*, from 2010, which distinguishes *Kline* in that context

24  in the FACTA, F-A-C-T-A, federal scheme that the two statutes

25  were different between *Bateman* and *Kline*.

1     And in the *Bateman* case the Ninth Circuit rejected the

2  *Kline* theory and said that if the statute didn't -- if the

3  legislative history --

4          **THE COURT:**  You've got to be more succinct.  You're

5  going on and on and on.

6          What did you want to say?

7          **MR. GROVER:**  Well, counsel's point is going to

8  something different.  The Court asked whether or not there were

9  cases that said the 5,000 is aggregated across the action or is

10  it per violation.

11     The cases I've cited are decisions by the California Court

12  of Appeal finding multiple calls in the case all were being

13  compensated for showing that it was per call.  And then there's

14  federal cases on that.

15     Counsel's aggregation discussion of *Kline*, which was

16  overruled by *Bateman*, was whether or not you should look at

17  whether the total damages added up together are so high that

18  class certification should be denied on that point alone, from

19  a superiority standpoint, and *Bateman* says no.

20          **THE COURT:**  All right.

21          **MR. GROVER:**  So it's two different issues.

22          **THE COURT:**  The next question:  With respect to

23  Attorney Eric Grover, which CIPA cases has he litigated to a

24  classwide settlement?

25     And then you have a chart here that starts with one in our

1  very court called *McKay*, 11.7 million, then goes down to other

2  settlements.  So it looks like a list of about 11 cases.

3          **MR. GROVER:**  I believe it's 12.

4          **THE COURT:**  Twelve, all right.

5          **MR. GROVER:**  42,928,000 total.

6          **THE COURT:**  So do you question this chart?

7          **MR. BESHADA:**  I do not, Judge.

8          **THE COURT:**  All right.  Next, Question 7:  Is it

9  possible to tell from the records available to the parties

10  which of the numbers were cellular phone numbers?

11      Answer:  Yes.

12      Is it further possible to tell the state of residence of

13  the person to whom that number is assigned?

14      What's the answer to that?

15          **MR. GROVER:**  Partially, yes.  There are some of the

16  records -- so I reproduced part of a chart.  It's a little hard

17  to see.  I have the whole page of the chart, if it's a little

18  easier.

19      This is information that the defendant already gleaned

20  from the calls.  In one of the columns, I and J are the

21  location and state where the phone number that was found is

22  associated with.

23      It also says on the chart that's a cellular call.  And it

24  would show, for example, what you can't see, it's -- it says,

25  like, Jackson, California, Fresno, California.

1              **THE COURT:**  I can't read that tiny print.

2              **MR. GROVER:**  I have a larger page of it, if you would

3    like.

4              **THE COURT:**  Yes.  Hand that up.  Thank you.

5         All right.  What do you say is the answer?

6              **MR. BESHADA:**  Your Honor, with respect to column I,

7    the location, that's where the phone is registered, not

8    necessarily where the call came from.

9         And with respect to Question 7A, it's possible to tell the

10   cell phone or the carrier.  And we can tell the carrier.

11   Although, we can't confirm that all of the carriers were

12   actually cellular telephones.  But from what Mr. Grover's

13   expert said and what our experts say, it's between a 60 and

14   95 percent positive that we can determine that.  That's

15   question 7A.

16        Question 7B, to determine where the actual calls came

17   from, we believe that that would be a very complicated analysis

18   that would require essentially the personal cell phone records

19   of every single class member to determine where they were at a

20   certain time when a certain call was made.

21             **MR. GROVER:**  Your Honor, that wasn't actually the

22   question.  The question was, is it possible to tell the state

23   of residence of the person to whom the number was assigned?

24        And so there's information on the data that they ran on

25   all the calls that shows at least where the phone is

1    registered.  Defendant also has information on everyone who

2    made an order, who made a call during that time period, and

3    where they shipped the order to.

4        And then, also, as our -- one of our experts put in her

5    declaration, that with the telephone numbers and reverse pin

6    process in the high 90s you can take a telephone number and

7    generate an accurate address.

8        **MR. BESHADA:**  And that's of where the phone is

9    registered as opposed to the example that Mr. Wuest actually

10   gave in his deposition testimony.

11       If you have a cell phone carrier with multiple phones on

12   one account, despite the fact that the account may be

13   registered in the state of California and the area code may be

14   the state of California, the call may be made on one of the

15   separate lines where the person may not necessarily be in the

16   state of California.  For example, children and their parents.

17       I have a daughter that goes to school in Alabama, and

18   she's on my account.  That phone would be registered to me at a

19   New Jersey address, yet calls from that phone -- and her

20   residence is actually the state of Alabama.

21       **MR. GROVER:**  The issue of where people make calls is

22   separate from the issue of the state of residence.  Where

23   people make calls is a damage question.

24       **MR. BESHADA:**  We don't agree.  We think you have to be

25   in the state of California to make the call.  So I think that

1  would be part of the qualification for being a class member as

2  opposed to a damage issue.

3       THE COURT:  All right.  Well, I've skipped ahead and

4  read the other answers that you've given to the other

5  questions.

6       To save time, I will just had -- on question number 11, I

7  am trying to find out whether or not any judge ever reviewed

8  any of the settlement agreements.

9       It sounds like the answer is no, but you say that was

10 dismissal -- these places where you say, yes, a judge signed

11 the dismissal, was that simply a form order saying dismissing

12 the case in light of the settlement?

13      MR. GROVER:  In California, under California Rule of

14 Court 3.770, you have to submit a declaration with information

15 as to why the case should be dismissed, and an order.  So the

16 Court gets the declaration and then a form of order, which they

17 can either choose to sign the form of order or issue their own

18 order.

19      THE COURT:  Well --

20      MR. GROVER:  So that's --

21      THE COURT:  Is that state court practice?

22      MR. GROVER:  That's a state requirement.  So all the

23 state court cases that was followed.

24      And then with regard to the federal cases, there were

25 41(a)(1)(2) stipulations filed, but still in some cases the

1  judge did sign off.

2       **THE COURT:**  What I'm trying to find out is whether or

3  not any judge ever blessed the dollar amounts.

4       **MR. GROVER:**  In at least one of -- *PepsiCo*, off the

5  top of my head, the dollar amount is in the declaration filed

6  with the state court.

7       **THE COURT:**  Including the attorneys' fees?

8       **MR. GROVER:**  It said total that would be paid for

9  everything.  And I believe -- it's in the record -- how many

10  calls that the plaintiff had.

11       **THE COURT:**  That would have been -- that would have

12  been a total of 35,000, of which -- based on two phone calls.

13       **MR. GROVER:**  Correct.

14       **THE COURT:**  Do you have that declaration here?

15       **MR. GROVER:**  It's in the docket.  I don't --

16       **THE COURT:**  Can I see it, please?

17       **MR. GROVER:**  Counsel has it.

18       **THE COURT:**  All right.  I'm looking at something

19  called *Wuest v. PepsiCo* Declaration of Eric Grover,

20  November 14th, 2017.

21     All right.  Is this the only one that called out the

22  dollar amount?

23       **MR. BESHADA:**  Your Honor, we have another one here,

24  which is the *Guitar Center, Inc.* case.  That also called out

25  the dollar amount.

1            **THE COURT:**  All right.  And what I'm going to be

2    asking, are there any others?  This one says total 5,000, but

3    does not say how it will be split up.  Okay.  Any others?

4            **MR. GROVER:**  Counsel is looking.  My recollection is

5    the other ones did not say the dollar amount.

6            **MR. BESHADA:**  That's all we have, Your Honor.

7            **THE COURT:**  In the *Comcast Cable* case, which was for

8    190,000, it says here there was one call.  So what accounts for

9    that large settlement?

10            **MR. GROVER:**  The total settlement?

11            **THE COURT:**  What?

12            **MR. GROVER:**  What accounts for the settlement?

13            **THE COURT:**  It's 190,000, but there was one phone

14    call.  The maximum recovery was $5,000.

15            **MR. GROVER:**  It accounted for the time and effort that

16    was put into the case and what the defendant was willing to

17    pay.

18            **THE COURT:**  How much time and effort was there?

19            **MR. GROVER:**  At least $175,000 in fees.  There was

20    multiple rounds of briefing at different levels.

21       As I said before, the aggregate time and expenses in all

22    these cases is less than the amount paid.

23            **THE COURT:**  See, the thing is, though, I don't buy

24    your 1021.5 argument because when you settle on an individual

25    basis it doesn't apply.

1              **MR. GROVER:**  But --

2              **THE COURT:**  The only recovery -- you're getting a

3    premium for the class action that never occurred.

4              **MR. GROVER:**  I just -- I disagree with that, that

5    that's the way to look at it.

6              **THE COURT:**  Okay.

7              **MR. GROVER:**  I mean, if we were trying to get people

8    to settle and not pursue a class action, we would contact them

9    before filing anything and say this is what we're planning to

10   do if you don't settle with us.

11        But we don't do that because the intention always is to

12   follow through with a class action.  I mean, that is --

13             **THE COURT:**  Mr. Wuest has never done it.  And he's

14   filed, what, 12 cases?

15             **MR. GROVER:**  Mr. Wuest has had a very strange set of

16   circumstances occur each time that are -- there's no

17   explanation for the oddball scenarios that have come up in his

18   cases, but they've all happened independently.

19        All these defendants are different.  I can't control the

20   facts that --

21             **THE COURT:**  He's the one that wants to be the

22   representative.

23             **MR. GROVER:**  And he wants to be the representative

24   here.  That's why we filed the motion.

25             **THE COURT:**  Maybe his track record is somebody who

1    can't be trusted.

2          **MR. GROVER:**  Well, what has he done that he can't be

3    trusted?

4          **THE COURT:**  He's extracted a premium for using the

5    Rule 23 device.  It's quite clear.

6          **MR. GROVER:**  Well, I just fundamentally disagree.

7          **THE COURT:**  Maybe the Ninth Circuit will bail you out,

8    but to my mind this makes -- this is a stain on the good name

9    of Rule 23.

10         **MR. GROVER:**  Well, I --

11         **THE COURT:**  Is Mr. Wuest here today?  Is that him back

12    there?

13         **MR. GROVER:**  No, he's at work.

14         **THE COURT:**  Where?

15         **MR. GROVER:**  At work.

16         **THE COURT:**  Okay.  All right.

17         **MR. GROVER:**  I mean, if we didn't file the motion -- I

18    mean, we've gone through the case.  We've litigated the case.

19    I litigate cases vigorously.  I've settled cases for good

20    value.  I'm taken class action case to trial.

21       I have been doing this for over 30 years.  I've not had

22    any court ever impugn my integrity.  I don't cut corners.  I

23    don't do things that are incorrect.

24         **THE COURT:**  Next time when Mr. Wuest darkens your

25    door, you ought to do a little bit more homework.  That's my

 1  advice to you.

 2      And I won't go so far as to impugn your integrity, but I

 3  will Mr. Wuest.  And any lawyer who is representing Mr. Wuest

 4  this many times with this many glitches should know better.

 5      So I am making a criticism of you.  I would have looked at

 6  any case Mr. Wuest brought to my door as a lawyer.  After this

 7  track record, I would have said to him, you know, we better

 8  look at it very, very carefully before we go down that road

 9  again.

10      But, you know, he's been a good profit center for you.

11          MR. GROVER:  He hasn't been a profit center.

12          THE COURT:  Yes, he has.  A half million dollars in

13  fees you've gotten out of Mr. Wuest.

14          MR. GROVER:  More than that in time.  So it's actually

15  not a profit center.

16          THE COURT:  That's what you say.  You know, let's get

17  your records.  Maybe I'll let these people take your deposition

18  to find out if that's really true instead of cutting and

19  pasting some other brief.

20      All right.  I'm going to give each of you -- on the

21  general issue of whether or not to certify class, I'll give

22  each of you an opportunity to say what you'd like to say.  Then

23  I've got to go to the Amtrak case.

24          MR. GROVER:  I'll add, with regard to the issues that

25  are being raised concerning Mr. Wuest and his ability to serve

```
 1    as a class representative, you know, the defendant is relying

 2    on the Backus case, which is Your Honor's case.  In that case

 3    it was an issue that that plaintiff's involvement in other

 4    cases went to the issue of reliance and whether or not he had

 5    certain knowledge.

 6         Here there's no question that the defendant was recording

 7    without a warning.  There's no question that the plaintiff

 8    called and was recorded without a warning.

 9         There's nothing about these other settlements -- I don't

10    even see how they come up in the context of the case and how

11    they're even part of the evidence in the case if we had a class

12    action.  How is it relevant that he was involved as a plaintiff

13    in a case in which there was a class action waiver and it

14    couldn't be pursued through certification?

15              THE COURT:  Okay.  Thank you.

16         What do you have to say?

17         MR. BESHADA:  Your Honor, on the issue of discovery

18    and the issues with the other settlements, I would like to put

19    on the record that we attempted to do that in Mr. Wuest's

20    deposition.

21         We were foreclosed from getting that information from the

22    attorney-client privilege, and we were not able to determine

23    exactly why he --

24              THE COURT:  Well, I got some of that information

25    today.
```

1            **MR. BESHADA:**  We think this case is on all fours in

2      Your Honor's decision in *Backus*.

3            **THE COURT:**  Well, *Backus* is a little different.   I

4      agree it's not on all fours, but it does raise very troubling

5      issues for the judge.  It's a different problem than *Backus*.

6      It's similar in one respect.

7            I want to just say I believe in class actions.  I believe

8      it's a very worthwhile rule.  I'm in favor of them.  But I have

9      a strong, strong dedication to the proposition that we need to

10     protect the absent class members.  And that means putting

11     somebody in charge of the class, the named representative, who

12     we can trust.

13           Now, there is a long-standing abuse that very few lawyers

14     engage in, which is to put in a class allegation and then

15     settle, settle for a premium.  The individual claim is only

16     worth $5,000.  There's no statutory right to fees, so how do

17     you get to these gigantic numbers?  Well, it's the premium.

18           If it was an individual case with no class action in

19     there, there's no way in the world that somebody would pay

20     $180,000 for a $5,000 case.  No way.  It's the class.  It's the

21     threat of a class that scares the defendants, and it's worth it

22     to them because of the cost of litigation and potential

23     exposure.

24           Now, most lawyers I have seen are above that, and that's

25     why Rule 23 continues to do good justice in America.  But we,

1  as judges, have got to exercise some oversight on the process

2  to avoid these abuses.  And I think Mr. Wuest -- if not the

3  lawyer, at least Mr. Wuest is Mr. Abuse, a-b-u-s-e.

4      All right.  So it's not quite the same as Mr. Backus.

5  It's a different problem.

6      All right.  I've got to let you all go and go to the next

7  case.  Thank you.

8          **MR. BESHADA:**  Thank you, Your Honor.

9          **MR. GROVER:**  Thank you for your time.

10         **THE COURT:**  You're most welcome.

11     (At 9:14 a.m. the proceedings were adjourned.)

12                      - - - - -

13

14              **CERTIFICATE OF REPORTER**

15     I certify that the foregoing is a correct transcript

16  from the record of proceedings in the above-entitled matter.

17  DATE: Wednesday, July 24, 2019

18

19

20                 *Katherine Sullivan*

21  _____

22         Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

23

24

25